**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04311 (SMB) |
| Plaintiff, | |
| v. | |
| ANDREW H. COHEN, | |
| Defendant. | |

**PLAINTIFF IRVING H. PICARD'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Post-Trial Scheduling Order (ECF No. 63), Plaintiff Irving H.

Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities

LLC under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and the

substantively consolidated estate of Bernard L. Madoff, by and through his undersigned counsel,

hereby submits the following Proposed Findings of Fact and Conclusions of Law in connection

with the trial of the above-captioned adversary proceeding against Defendant Andrew H. Cohen

(the "Adversary Proceeding").

## PROPOSED FINDINGS OF FACT

### Bernard L. Madoff Investment Securities LLC

1.      From 1987 through its collapse in 2008, Bernard L. Madoff Investment Securities

LLC ("BLMIS") was headquartered in the "Lipstick Building," located at 885 Third Avenue,

New York, New York.  Second Revised Joint Pretrial Order, Stipulated Facts at page 6 ("JPTO

at 6"[1]); Expert Report of Bruce G. Dubinsky,[2] attached as Exhibit 1 to the Declaration of Bruce

G. Dubinsky, at pages 16-17, marked as Trial Exhibit PX20-A ("PX20-A-20:21 (¶ 35)" [3]).

2.      BLMIS operated three business units: (i) a market-making business; (ii) a

proprietary trading business; and (iii) an investment advisory ("Investment Advisory") business.

(PX20-A-20:21 (¶ 35)).

3.      During all time periods relevant in this Adversary Proceeding,[4] BLMIS was

registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under

Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  (JPTO at 6; PX20-A-

21:22 (¶ 35)).

### The Investment Advisory Business

4.      BLMIS reported to the customers of its Investment Advisory business that their

---

[1] Further references to the stipulated facts reached by the Parties as set forth in Section III of the Second Revised Joint Pretrial Order (ECF No. 60) will be abbreviated in like fashion.

[2] Mr. . Dubinsky, as well as Lisa M. Collura and Matthew B. Greenblatt, the Trustee's other two expert witnesses, were all qualified, pursuant to Federal Rule of Evidence 702 and other applicable law, to provide the expert testimony offered in their trial declarations, which were respectively marked as Trial Exhibits PX20-A, PX18-A, and PX22-A.  (JPTO at 8-9 (wherein the Parties have stipulated to the experts' qualifications); Transcript of Hearing Re: Trial at 17, Adversary Proceeding (Oct. 14, 2015) ("Trial Transcript") (wherein this Court similarly qualified each as an expert witness)).

[3] Further references to the Trustee's Trial Exhibits will be abbreviated in a similar manner.  For the Court's convenience, the Trustee will also include parenthetical references to the specific numbered paragraphs of the declarations and/or expert reports.

[4] As discussed below, Mr. Cohen opened his Investment Advisory account in early 1996 and retained it through BLMIS's collapse in late 2008.  (JPTO at 6, 7; PX-22-A-13 (¶ 39)).  Thus, all relevant periods for purposes of this Adversary Proceeding span across that thirteen-year timeframe.

accounts were invested in one of several investment strategies.  (PX20-A-21:22 (¶¶ 40-44)).

5.      For a number of years, many Investment Advisory accounts were purportedly invested in the "convertible arbitrage" strategy, wherein BLMIS reported that it was achieving profits by taking advantage of price mismatches that may occur between the equity markets and the bond/preferred equity markets.  (PX20-A-22 (¶ 42)).

6.      Another strategy purportedly employed in many Investment Advisory accounts was the so-called "split-strike conversion" strategy, wherein BLMIS reportedly invested in a basket of common stocks within the Standard & Poor's 100 Index and reportedly sold call options and bought put options to hedge against price changes in the underlying basket of stocks. (PX20-A-22 (¶ 43)).

### The Ponzi Scheme at BLMIS

7.      For all relevant periods in this Adversary Proceeding (and at least as far back as the 1970s), there is no evidence that BLMIS actually executed the trades in any purported strategy which were reported on the account statements of its Investment Advisory customers. (PX20-A-16 (¶ 18)).

8.      For all relevant periods in this Adversary Proceeding, the trades reported in the statements for the Investment Advisory accounts were pure fiction.  (PX20-A-36:124 (¶¶ 82-289)).

9.      The Investment Advisory business was nothing more than a Ponzi scheme, utilizing new customer monies to fund the withdrawal of principal and fictitious profits for its older customers.  (JPTO at 8; PX20-A-18 (¶ 28); PX20-A-24 (n.39); PX20-A-115:122 (¶¶ 264-286); PX20-B at 92; PX18-A-8:16 (¶¶ 17-42)).

10.     During at least the ten-year period before its collapse on December 11, 2008,

BLMIS primarily used three bank accounts for Investment Advisory customer deposits and withdrawals:  JPMorgan Chase account #xxxxx1703 (the "BLMIS 703 Account"); JPMorgan Chase account #xxxxxxxxx1509 (the "BLMIS 509 Account"); and Bankers Trust account #xx-xx0-599 (the "BLMIS BT Account,"[5] and collectively with the BLMIS 703 Account and the BLMIS 509 Account, the "BLMIS Bank Accounts").  (PX18-A-8:16 (¶¶ 17-42); PX20-A-31 (¶ 76)).

11.    Those customers who withdrew more funds than they had invested into their Investment Advisory accounts[6] received fictitious profits from the Ponzi scheme, which profits were nothing more than other customers' money held in the BLMIS Bank Accounts.  (JPTO at 8; PX20-A-120:124 (¶¶ 279-289)).

12.    Further evidence of the existence of the Ponzi scheme at BLMIS includes, but is not limited to, the following: (i) the Investment Advisory business was not generating any legitimate profits since no trading activity was taking place; (ii) the Investment Advisory business was not receiving legitimate financial support from the other business units of BLMIS in amounts sufficient to satisfy the cash requirement needs of the Investment Advisory customer withdrawals; and (iii) the Investment Advisory business was not receiving any legitimate outside financial support vis-à-vis loans or otherwise.  (JPTO at 8; PX20-A-18 (¶ 28); PX20-A-115:124 (¶¶ 264-289)).

<u>Andrew H. Cohen and His Account at BLMIS</u>

13.    Between 1991 and 2000, Defendant Andrew H. Cohen ("Mr. Cohen") was

---

[5] BLMIS had ceased using the BLMIS BT Account in May 1999.  (PX18-A-15 (¶¶ 39-41)).

[6] Mr. Greenblatt, along with a team of professionals at FTI Consulting, Inc. working under his direct supervision, calculated every account holder's principal balance on a daily basis during the period from April 1, 1981 through December 11, 2008 (the "Principal Balance Calculation").  PX22-A-4 (¶ 8 & Attachment 2 thereto)).

employed by BLMIS as a trader on its market-making desk.  (JPTO at 6).

14.     In early 1996, Mr. Cohen opened an Investment Advisory account at BLMIS (the "Account").  (JPTO at 6; PX1-1:6; PX2-1; PX22-A-13 (¶ 41); PX18-A-17 (¶ 47)).

15.     The Account was assigned account number 1C1219.  (JPTO at 6; PX2-2; PX18-A-4:5 (¶ 12); PX22-A-4 (¶ 10)).

16.     Mr. Cohen received monthly statements for the Account from January 1996 through November 2008.  (JPTO at 6; PX2-1:892).

17.     Before BLMIS's collapse on December 11, 2008, Mr. Cohen had no knowledge or notice of any wrongdoing or fraudulent intent on the part of BLMIS.  (JPTO at 7).

                    The Principal Balance Calculation for the Account

18.     Over the years, Mr. Cohen provided money to BLMIS to purportedly invest in the Account.  (JPTO at 6).

19.     All of the investments or deposits made by Mr. Cohen in connection with the Account were reported in the monthly statements for the Account.  (JPTO at 7; PX2-1:892; PX22-A-15 (¶¶ 44-45); PX22-B (Expert Report of Matthew B. Greenblatt at Exhibit 4)).

20.     In all, Mr. Cohen made 25 separate deposits into the Account, which totaled $2,921,539.  (JPTO at 7; PX22-A-15 (¶¶ 44-45)).

21.     Mr. Cohen also withdrew money from the Account over the years, and always did so by making a written request to BLMIS.  (JPTO at 6; PX6-1:19 & 21:42; PX18-A-20:22 (¶¶ 54-64 & Attachment F thereto)).

22.     All of Mr. Cohen's withdrawals from the Account were reported in the monthly statements for the Account.  (JPTO at 7; PX2-1:892; PX22-A-18:19 (¶¶ 48-49)); PX22-B (Expert Report of Matthew B. Greenblatt at Exhibit 4)).

23.      In all, Mr. Cohen received 41 separate withdrawals from the Account, which

totaled $4,065,000.  (JPTO at 7; PX2-1:892; PX22-A-18:19 (¶¶ 48-49)).

24.      Of the withdrawals made by Mr. Cohen from the Account, a total of $1,143,461

was received by Mr. Cohen in excess of the principal he had invested in the Account (the

"Avoidable Transfers"), representing fictitious profits from the Ponzi scheme.  (JPTO at 7;

PX22-A-19 (¶ 49)).

The Collapse of BLMIS and the Liquidation Proceeding

25.      In late 2008, the amount of Investment Advisory customer property at BLMIS,

which consisted entirely in the form of cash held in the BLMIS 703 Account and the BLMIS 509

Account, had dwindled to the point where customer redemptions or withdrawal requests

exceeded the customer property available.  (PX20-A-21 (¶ 39); PX18-A-16 (¶ 42)).

26.      On December 11, 2008, Madoff was arrested for violating numerous federal

criminal securities statutes.  (JPTO at 5; PX20-A-23 (¶ 47)).

27.      As of December 11, 2008, BLMIS was deeply insolvent.  (PX20-A-161:166 &

860 (¶¶ 349-359 & Exhibit 27)).

28.      On December 11, 2008, BLMIS was holding approximately $1 million of

Investment Advisory customer property while claims held by Investment Advisory customers for

the return of their principal totaled nearly $20 billion.  (PX20-A-860 (Exhibit 27)).

29.      On  December 11, 2008 (the "Filing Date"), the SEC commenced proceedings

against BLMIS and Madoff in the United States District Court for the Southern District of New

York (the "District Court").  (JPTO at 5; Complaint, *Securities Exchange Commission v.

Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "Liquidation

Proceeding") (ECF No. 1)).

30.     On December 15, 2008, the Securities Investor Protection Corporation ("SIPC")

filed an application, pursuant to § 78eee(a)(4)(B) of SIPA, in the District Court because BLMIS

was not able to meet its obligations to securities customers as they became due and thus its

customers needed the protections afforded by SIPA.  (JPTO at 5; Application of the Securities

Investor Protection Corp., Liquidation Proceeding (ECF No. 5)).

31.     On December 15, 2008, the SEC consented to a combination of its own action

with SIPC's application pursuant to § 78eee(a)(4)(A) of SIPA.  (JPTO at 6; Application of the

Securities Investor Protection Corp., Liquidation Proceeding (ECF No. 5) at 10).

32.     On December 15, 2008, the District Court granted SIPC'S application and entered

an order pursuant to SIPA which, in relevant part: (i) appointed the Trustee as the trustee for the

liquidation of BLMIS pursuant to § 78eee(b)(3) of SIPA; (ii) appointed Baker & Hostetler LLP

as counsel to the Trustee pursuant to § 78eee(b)(3) of SIPA; and (iii) removed the case to this

Court pursuant to § 78eee(b)(4) of SIPA.  (JPTO at 5-6; Order, Liquidation Proceeding (ECF No.

4)[7]).

33.     In connection with the underlying Liquidation Proceeding, the Trustee has been

found to be a disinterested party in these proceedings, and has been found to be duly qualified to

serve and act on behalf of the estate of BLMIS.  (JPTO at 6; Order of Disinterestedness of

Trustee and Counsel to Trustee, Liquidation Proceeding (ECF No. 69)).

<u>The Adversary Proceeding Against Mr. Cohen and the Avoidable Transfers</u>

34.     On November 26, 2010, the Trustee brought this adversary proceeding against

Mr. Cohen to avoid and recover fraudulent transfers totaling $1,143,461 (as defined above, the

---

[7] Once before this Court, the Liquidation Proceeding was assigned Case No. 08-01789 and the District Court's order
was docketed as ECF No. 1.

"Avoidable Transfers") received by Mr. Cohen in connection with the Account. (Complaint, Adversary Proceeding (ECF No. 1)).

35.     Each of the Avoidable Transfers was made within the two-year period prior to December 11, 2008. (JPTO at 7; PX-22-A-18:19 (¶ 49)).

36.     Mr. Cohen received each of the Avoidable Transfers. (JPTO at 7; PX18-A-22:32 (¶¶ 65-84); PX18-B (Attachment J); PX11-1:386).

37.     Each of the Avoidable Transfers constituted a transfer of an interest of BLMIS in property within the meaning of Section 101(54) of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA. (JPTO at 8; PX18-A-17:19 (¶¶ 47-53)).

38.     Each of the Avoidable Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing and/or future creditors within the meaning of Section 548(a)(1)(A) of the Bankruptcy Code. (JPTO at 8; PX20-A-18 (¶ 28) & 115:124 (¶¶ 264- 289)).

<u>The Lack of Sufficient Customer Property to Pay All Customer Claims in Full</u>

39.     The customer property on hand at BLMIS as of December 11, 2008 was not sufficient to pay in full the claims that customers could file for the return of the principal that they had invested and not received back from BLMIS. (PX20-A-860 (Exhibit 27)).

40.     On December 22, 2014, the Trustee filed a motion in the underlying Liquidation Proceeding seeking this Court's approval (a) to allocate approximately $700 million in additional monies to the fund of BLMIS customer property (the "Customer Fund"), which would bring the total amount allocated to the Customer Fund to approximately $10.5 billion and (b) to make a further pro rata interim distribution based on a Net Investment Method Denominator[8] which,

---

[8] The "Net Investment Method Denominator" is the aggregate of the allowed customer claims together with the net

together with a required 3% Time-Based Damages Reserve, totaled approximately $21 billion at

that time.  (Motion for an Order Approving Fifth Allocation of Property to the Funds of

Customer Property and Authorizing Fifth Interim Distribution ("Fifth Interim Distribution

Motion"), Liquidation Proceeding (ECF No. 8860)).

41.    On January 15, 2015, this Court held a hearing in the underlying Liquidation

Proceeding on the Fifth Interim Distribution Motion and, based on the moving papers and

arguments of counsel, entered an order approving the Trustee's request.  (Order Approving a

Fifth Allocation of Property to the Funds of Customer Property and Authorizing Fifth Interim

Distribution to Customers, Liquidation Proceeding (ECF No. 9014)).

42.    On November 18, 2015, this Court is scheduled to hear, in the underlying

Liquidation Proceeding, the Trustee's motion seeking this Court's approval (a) to release

approximately $1.5 billion in funds held in reserve and the vast majority of which having already

been allocated to the Customer Fund, which totaled approximately $10.9 billion as of September

30, 2015 and (b) to make a further pro rata interim distribution based on the Net Investment

Method Denominator which, as of September 30, 2015, totaled approximately $18.5 billion.

(Motion Notice of Hearing and Supplemental Filing in Further Support of the Trustee's Motion

for an Order Approving Sixth Allocation of Property to the Fund of Customer Property and

Authorizing Sixth Interim Distribution to Customers (ECF No. 11834)).

---

cash balance for all accounts into which more funds were deposited than withdrawn for which a claim was filed but
not yet allowed.

## PROPOSED CONCLUSIONS OF LAW

**I.    Mr. Cohen's Fraudulent Transfers Are Avoidable And Recoverable By The Trustee**

Under Bankruptcy Code Section 548(a)(1)(A), the Trustee may avoid any transfer made by BLMIS within two years before the Filing Date if BLMIS "made such transfer. . .with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made. . . indebted. . . ."  11 U.S.C. § 548(a)(1)(A).[9]  Once a transfer is avoided, the Trustee "may recover, for the benefit of the estate, the property transferred, or . . .the value of such property" pursuant to Section 550(a) of the Bankruptcy Code.  11 U.S.C. § 550(a).[10]  The Trustee has general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA.  *See* SIPA § 78fff-1(b).  When the fund of customer property is insufficient to satisfy the payments called for under SIPA § 78fff-2(c)(1), SIPA grants the Trustee the power to recover any property transferred by the debtor that would have constituted customer property if such property had not been transferred and is voidable or void under the Bankruptcy Code.  *See* SIPA § 78fff-2(c)(3).

Here, in the context of an admitted Ponzi scheme, transfers made by BLMIS in the two year period prior to its collapse are presumed to have been made by BLMIS with the "actual intent to hinder, delay, or defraud" within the meaning of 11 U.S.C. § 548(a)(1)(A).  *See Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011); *Bear, Stearns Sec. Corp. v.*

---

[9] Section 548(a)(1)(A) provides, in relevant part, "The trustee may avoid any transfer . . .of an interest of the debtor in property . . .that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer . . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted."

[10]  Section 550(a) provides, in relevant part, that to the extent that a transfer is avoided under specified sections of the Bankruptcy Code, including sections 544, 547 and 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

*Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit . . . "); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2006) (finding that a debtor operating a Ponzi scheme is presumed to have made transfers with fraudulent intent); *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 633–34 (Bankr. S.D.N.Y. 2007) (same). Thus, where an entity functioned as a Ponzi scheme, transfers from the entity were made with the requisite fraudulent intent as a matter of law.

Based on the Parties' stipulations set forth at pages 6 to 9 of the Second Revised Joint Pretrial Order, there is no dispute that the Avoidable Transfers constitute actual fraudulent transfers under Section 548(a)(1)(A). The Parties stipulated that Mr. Cohen (a) held an investment advisory account with BLMIS (as defined above, the "Account"), (b) deposited $2,921,539 in the Account, (c) withdrew $4,065,000 from the Account, and (d) therefore received $1,143,461 in excess of the principal he had invested in the Account (as defined above, the "Avoidable Transfers"), all of which he received within the two-year period prior to the Filing Date. *See* JPTO at 7. The Parties further stipulated that BLMIS operated a Ponzi scheme through its Investment Advisory business. *See* JPTO at 8. By virtue of the Parties' stipulations and the other evidence now before this Court, the Trustee has thus established: (a) all of the required elements, under Section 548(a)(1)(A) of the Bankruptcy Code, to avoid the Avoidable Transfers; and (b) all of the required elements, under Section 550(a) of the Bankruptcy Code, entitling the Trustee to recover the Avoidable Transfers, or the value thereof, from Mr. Cohen.

## II.   Mr. Cohen's Seven Contentions Have No Merit

Given the foregoing, the only remaining issues before this Court are purely legal issues relating to the seven contentions raised by Mr. Cohen in the Second Revised Joint Pretrial Order wherein he seeks offset his avoidance liability to the Trustee. *See* JPTO at 9-10. Mr. Cohen's

contentions can be summarized as follows: the Trustee lacks standing to bring this Adversary

Proceeding (Contention Nos. 3 & 4); Mr. Cohen is entitled to a value defense under Section

548(c) (Contention Nos. 1 & 2); the Trustee has violated Mr. Cohen's due process rights

(Contention Nos. 5 & 6); and the Trustee fails to account for the time value of money

(Contention No. 7).  As set detailed below, each of the contentions raised by Mr. Cohen is

without basis and fails as a matter of law.

### A.       The Trustee Has Standing To Bring The Adversary Proceeding

The Trustee's standing emanates from SIPA, which grants the Trustee the general powers

of a bankruptcy trustee and the authority to conduct a SIPA liquidation proceeding "in

accordance with, and as though it were being conducted under chapters 1, 3, and 5 and

subchapters I and II of chapter 7 of title 11."[11]  In addition, SIPA § 78fff-2(c)(3) expressly

incorporates the Bankruptcy Code's avoidance provisions and authorizes the Trustee to recover

any fraudulent transfers made by the debtor, including those made to customers.[12]  The Second

Circuit, the District Court, and this Court have affirmed the Trustee's standing to prosecute

avoidance actions against BLMIS customers, such as Mr. Cohen.  *See, e.g., Picard v. Greiff*, 476

B.R. 715, 728 (S.D.N.Y. 2012) (stating "the Trustee may . . . avoid those fraudulent transfers of

customer property for distribution in accordance with SIPA's priorities.") (citing SIPA § 78fff–

2(c)(3)).

Nevertheless, Mr. Cohen raises the following contentions challenging the Trustee's

---

[11] *See* SIPA §§ 78fff(b), 78fff-1(a);  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d Cir. 2011), *cert. denied sub nom.* ("*Second Circuit Net Equity Decision*") ("Pursuant to SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties, specified by the Act, related to recovering and distributing customer property.") (citing SIPA § 78fff-1).

[12] *See* SIPA § 78fff-2(c)(3); *Second Circuit Net Equity Decision*, 654 F.3d at 242 n.10 ("SIPA and the [Bankruptcy] Code intersect to ... grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers.") (alterations in original) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010) ("*Net Equity Decision*").

standing:

- the Trustee cannot recover the Avoidable Transfers because the funds transferred were never property of BLMIS but funds "held by a fiduciary for a customer's benefit;"

- the Trustee cannot bring avoidance actions based on the doctrine of *in pari delicto*; and

- the Trustee lacks standing under SIPA §78fff-2(c)(3).

*See* JPTO at 10 (Contention Nos. 3 & 4).  Each of these contentions is contrary to settled

authority, and inconsistent with the fundamental purposes of SIPA and the statutory authority it

grants to the Trustee.

      **1.**      **The Trustee Has Standing To Recover Transfers As Property Of The Estate**

This Court has already rejected the argument that the Trustee lacks Article III standing

because BLMIS never had an interest in the customer property that the Trustee seeks to avoid

and recover here and in other adversary proceedings before this Court.  The Trustee "administers

two distinct estates, a general estate consisting of the property of the estate of BLMIS as defined

in 11 U.S.C. § 541(a) and an estate consisting of customer property."  *Sec. Investor Prot. Corp.*

*v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 448 (Bankr. S.D.N.Y. 2015) ("Omnibus Good

Faith Decision").  Although a trustee ordinarily cannot avoid and recover a broker's transfer of

funds held on behalf of its customers, "SIPA circumvents this problem through a statutorily

created legal fiction that confers standing on a SIPA trustee by treating customer property as

though it were 'property of the debtor' in an ordinary liquidation."  *Id.* (quoting *Picard v.*

*Fairfield Greenwich Ltd.,* 762 F.3d 199, 213 (2d Cir. 2014)).  "With this fiction, the Trustee may

exercise an ordinary trustee's powers under the Bankruptcy Code to avoid and recover . . .

fraudulent transfers of customer property for the benefit of the customer estate."  *Id.*

Within this framework, this Court concluded that the Trustee has Article III standing to

avoid and recover fraudulent transfers received by BLMIS customers, such as Mr. Cohen:

> A fiduciary that sues as a representative of an insolvent estate to avoid and recover transfers for the benefit of that estate satisfies the requirement for Article III standing. Here, the estate of customer property suffered the injury in fact by virtue of BLMIS fraudulent transfers of that property, the Trustee's lawsuits will redress that injury, and . . .the estate is insolvent. Any recovery from the defendants will be deemed customer property and replenish the funds available to satisfy the customers' net equity claims. Accordingly, the Trustee has established Article III standing.

*Omnibus Good Faith Decision*, 531 B.R. at 449.

Well-settled case law also holds that funds transferred in furtherance of a fraudulent scheme constitute property of the estate under the Bankruptcy Code and customer property under SIPA.  *See, e.g.*, *Rosenman Family, LLC v. Picard*, 395 F. App'x. 766, 769 (2d Cir. 2010); *Rosenman Family, LLC v. Picard*, 401 B.R. 629, 635-36 (Bankr. S.D.N.Y. 2009) (ruling that funds deposited by an investor to BLMIS's bank account at JPMorgan Chase constituted customer property); *Jobin v. Lalan (In re M&L Bus. Mach. Co., Inc.)*, 160 B.R. 851, 857 (Bankr. D. Col. 1993) ("There is no argument but that the investors gave their money to the Debtor voluntarily.  Thus, at the time of each investment, the Debtor had at least the legal right to possession… All that § 548 requires is the transfer of an 'interest' by the Debtor.").  Finally, this argument was previously raised in a motion to withdraw the reference in these proceedings, but the District Court, in declining to withdraw on that issue, ruled that "SIPA and the Bankruptcy Code work in tandem to grant the Trustee the authority to bring statutory avoidance and recovery claims [against BLMIS customers] on behalf of the estate itself [pursuant to] 15 U.S.C. §78fff-2(c)(3)."  *Picard v. Roman*, No. 12 Civ. 2318 (JSR), 2012 WL 5816849, at *2 (S.D.N.Y. Nov. 13, 2012).

Because the customer property at issue is treated as the property of BLMIS, the Trustee

enjoys standing under Article III to bring avoidance claims against Mr. Cohen.

> **2.      The Trustee Claims Are Not Barred By The Doctrine of *In Pari Delicto***

This Court similarly rejected the contention, pressed anew by Mr. Cohen that the Trustee

lacks standing under the doctrine of *in pari delicto*. This Court specifically held that "neither the

doctrine of *in pari delicto* nor the rule of *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d

114 (2d Cir.1991) bars the Trustees claims." *Omnibus Good Faith Decision,* 531 B.R. at 449.

This Court reasoned, "The Trustee's claims to avoid and recover customer property never

belonged to the debtor under state law. Instead, they were created by Congress and conferred on

the Trustee pursuant to SIPA § 78fff–2(c)(3) and the pertinent provisions of the Bankruptcy

Code. Consequently, the aforementioned doctrines do not deprive the Trustee of standing or

otherwise prevent him from asserting the avoidance claims against the defendants." *Id.* at 449-

50 (citing, among other authority, *Fox v. Picard (In re Madoff Sec.)*, 848 F. Supp. 2d 469, 483

(S.D.N.Y. 2012), *aff'd*, 740 F.3d 81 (2d Cir. 2014)).  The second basis on which Mr. Cohen

challenges the Trustee's standing cannot be sustained.

> **3.      The Trustee Has Standing To Bring This Action Under SIPA Given The Lack of Sufficient Customer Property To Pay Customer Claims In Full**

SIPA § 78fff–2(c)(3) authorizes the Trustee to avoid and recover fraudulently transferred

customer property "whenever customer property is not sufficient to pay in full" customer claims

set forth in § 78fff-2(c)(1).[13]  Although the statute is silent on the timing of the sufficiency

evaluation, "it has long been held 'that the fund of customer property shall be valued for the

---

[13] Section 87fff-2(c)(1) provides that the trustee shall allocate customer property of the debtor as follows: "(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-(c)(1). . . ; (B) to customers . . .who shall ratably. . .on the basis and to the extent of their respective net equities; (C) to SIPC as subrogee for the claims of customers; and to SIPC in repayment of advances made by SIPC pursuant to section 78fff-(c)(2). . . ."

purposes of 15 U.S.C. §78fff-2(c)(3) as of [the filing date],'" *Picard v. Flinn Invs., LLC*, 463

B.R. 280, 284 (S.D.N.Y. 2011) (quoting *Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler*

*& Schulman, Inc.*), 83 B.R. 880, 898 (Bankr. D.N.J. 1988) ("*Bevill, Bresler*")), and not as of

some later moment in time which may be particular to a given adversary proceeding.

     The defendants in *Bevill, Bresler*—financial institutions sued by a SIPA trustee for the

return of customer property— argued, as Mr. Cohen likely will do here, that the trustee should be

required to prove the insufficiency of the fund of customer property for purposes of SIPA

§ 78fff-2(c)(3), either as of the time an avoidance complaint was filed or when a judgment is

entered. 83 B.R. at 892. The court rejected the imposition of these "enormous administrative

expenses" even where there was a possibility that avoidance of a particular transfer was not

necessary to bring the fund of customer property to 100%, finding that the "purpose of SIPA, and

the responsibility of the court, is to administer the estate in a manner that benefits all customers,

not just defendants in avoidance actions." *Id.* at 893. As the *Bevill, Bresler* court recognized, if

by the passage of time, a trustee recovered 100% of the funds necessary to satisfy all net equity

claims and SIPC, a defendant in an avoidance action would receive the benefit of that recovery

by asserting a claim against the general estate after satisfying the avoidance action judgment. *Id.*

at 891. Indeed, SIPA expressly contemplates this possibility. *See* SIPA § 78fff-2(c)(1) ("Any

customer property remaining after allocation in accordance with this paragraph shall become part

of the general estate of the debtor.").

     In *Flinn*, the District Court refused to withdraw the reference to this Court in connection

with several avoidance actions filed in the Liquidation Proceeding on the issue of the timing of

the sufficiency evaluation under § 78fff-2(c)(2) because it saw no issue to decide:

> [I]t has long been held "that the fund of customer property shall be
> valued for the purposes of 15 U.S.C. §78fff-2(c)(3) as of [the filing

date]," *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 898 (Bankr. D.N.J. 1988), and no "substantial and material consideration of non-Bankruptcy Code federal statutes" is required to see why this is so: any different interpretation of §78fff-2(c)(3) would cause the Trustee's powers to fluctuate, leading to a 'logistical nightmare.' *Id.* at 893. The Trustee might file a meritorious claim, but find himself unable to pursue it later for reasons wholly unrelated to the claim itself. Moreover, if the Trustee does avoid more than he needs to satisfy customer claims, SIPA provides that a recipient of an avoided transfer "shall be deemed to have been a creditor," allowing her to recover at least some of what the Trustee avoided. 15 U.S.C. § 78fff-2(c)(3).

463 B.R. at 284.

At trial here, the Trustee furnished uncontroverted evidence that as of the Filing Date, the amount of customer property on hand at BLMIS was woefully insufficient to pay in full the claims held by Investment Advisory customers for the return of the principal that they had invested and not received back from BLMIS. *See* PX20-A-860 (Exhibit 27)).[14] Thus, it is clear that the Trustee has standing, pursuant to SIPA § 78fff-2(c)(3), to avoid and recover the Avoidable Transfers from Mr. Cohen.

---

[14] Assuming *arguendo* that § 78fff-2(c)(3) contemplates that the sufficiency of customer property should be measured at some later moment in time, the customer property recovered by the Trustee to date is still insufficient to pay the allowed customer claims in full. *See infra, Proposed Findings of Fact,* ¶¶ 39-42. This Court may take judicial notice of motions and orders filed in the underlying Liquidation Proceedings. Fed. R. Evid. 201 (providing that a court may judicially notice facts that are not "subject to reasonable dispute" "at any stage of the proceeding"). *See also Krakowski v. Am. Airlines, Inc., (In re AMR Corp.)*, 536 B.R. 360, 363-64 n.2 (S.D.N.Y. Bankr. 2015) (taking judicial notice of the proceedings in the underlying bankruptcy case which were relevant to the pending motion and citing a string of cases in support); *Development Specialists, Inc. v. Dechert LLP*, No. 11 Civ. 5984, 2013 WL 4573733 at * 3 n.5 (S.D.N.Y. Aug. 22, 2013) (holding that, although a report was not attached or referenced in complaint, "it was filed in the underlying bankruptcy case, and thus the Court may take judicial notice of it"); *O'Rourke v. Seaboard Surety Co., Inc. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 958 (9th Cir. 1989) (holding that bankruptcy court properly considered records of underlying bankruptcy proceeding, reasoning that "[t]he record in an adversary proceeding in bankruptcy presumes and in large measure relies upon, the file in the underlying case." (*quoting Serge v. Sweet (In re Berge)*, 37 B.R. 705, 708 (W.D. Wis. 1983)). As this Court has recently noted, "The notion that the customer property fund will ever be sufficient to pay 100% of the net equity claims is speculative, and the undisputed facts show that at present it is insufficient." *Omnibus Good Faith Decision,* 531 B.R. at 453; *see also* Transcript of Hearing Re: Eighteenth Interim Fee Applications, at 14:4-7; 18:5-6, *In re Madoff Sec.*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Aug. 20, 2015) ("there won't be 100 percent distribution or it's not likely there will be 100 percent distribution to the customers. . .In light of the fact that there isn't enough money in the estate to pay 100 percent. . .")

**B.     The Antecedent Debt Decision Is The Law Of The Case**

In the Second Revised Joint Pretrial Order, Mr. Cohen again argues that he received the

Avoidable Transfers "for value" because such false profits were on account of a valid antecedent

debt within the meaning of Section 548(d)(2)(A).  *See* JPTO at 9-10 (Contention Nos.1 & 2).

Mr. Cohen recognizes his antecedent debt arguments have already been rejected by the District

Court and by this Court in other proceedings.  *See* JPTO at 9, n.6.  However, Mr. Cohen fails to

acknowledge that he too was a party to the withdrawn proceedings wherein the District Court

extensively considered the issue of antecedent debt and ruled that as a matter of law, Mr. Cohen

and other BLMIS customers are not entitled to retain avoidable transfers they received from

BLMIS under Section 548(c) because such transfers do not constitute the "satisfaction of . . .

antecedent debt" within the meaning of the statute.  *See Sec. Investor Prot. Corp. v. Bernard L.*

*Madoff Inv. Sec. LLC (In re Madoff Sec.),* 499 B.R. 416, 424 (S.D.N.Y. 2013) (the "Antecedent

Debt Decision") (holding that "only a defendant's investment of principal may count as 'value'

with respect to the customer property estate for purposes of section 548(c)").[15]

Mr. Cohen thus has already had his "day in court," and this Court should not revisit the

same issues raised and disposed of by the District Court.  As this Court observed in the *Omnibus*

*Good Faith Decision*, "Those moving defendants that participated in the withdrawal of the

reference of the antecedent debt/value issue have had their day in court and Judge Rakoff's

decisions are law of the case.  Judge Rakoff returned the proceedings to this Court 'for further

proceedings consistent with [its] Opinion and Order.' This sounds like a mandate."  531 B.R. at

---

[15] *See also Greiff*, 476 B.R. at 725 (holding that "those transfers from BLMIS to defendants that exceeded the return of defendants' principal, *i.e.*, that constituted profits, were not 'for value'. . .the transfers must be assessed on the basis of what they really were; and they really were artificial transfers designed to further the fraud, rather than any true return on investments.")

466 (quoting *Antecedent Debt Decision*, 499 B.R. at 430). *See also United States v. Ben Zvi*,

242 F.3d 89, 95 (2d Cir. 2001) (holding that "[t]he mandate rule 'compels compliance on remand

with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly

decided by the . . . court" (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993)); *United

States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) ("The [mandate] rule is essential to the

orderly administration of justice, as it is aimed at preventing obstinate litigants from repeatedly

asserting the same arguments and at discouraging opportunistic litigants from appealing

repeatedly in the hope of acquiring a more favorable appellate panel."). "The 'mandate rule'

ordinarily forecloses relitigation of all issues previously . . . decided by the appellate court."

*United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).[16]

Further, "[t]o determine whether an issue remains open for reconsideration on remand,

the trial court should look to both the specific dictates of the remand order as well as the broader

'spirit of the mandate.'" *Ben Zvi*, 242 F.3d at 95 (quoting *United States v. Kikumura*, 947 F.2d

72, 76 (3d Cir. 1991)).  Here, the District Court remanded Mr. Cohen's avoidance action, along

with hundreds of other adversary proceedings to this Court, after having withdrawn the reference

made to this Court, "in order to undertake the 'significant interpretation' of securities law

necessary to resolve" certain antecedent debt defenses raised by Mr. Cohen and others.  *Flinn*,

---

[16] The mandate rule is one of the two branches of law of the case doctrine.  "The second and more flexible branch is implicated when a court reconsiders *its own ruling* on an issue in the absence of an intervening ruling on the issue by a higher court" and "holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in that same case, unless 'cogent' and 'compelling' reasons militate otherwise." *Quintieri*, 306 F.3d at 1225 (emphasis added) (citing *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) and *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)).  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Tenzer*, 213 F.3d at 39 (internal citation omitted).  Mr. Cohen seeks to revisit the ruling of the District Court, and thus the doctrine's second branch is inapplicable here.  Nevertheless, even if it were implicated, there is no ground to justify reconsideration of the District Court's decision.  *See, e.g., North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (holding that "a court may depart from the law of the case where a fundamental change in the law impacts directly upon the parties' rights and obligations" but cautioning that "the law of the case should be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated") (internal citations omitted)).

463 B.R. at 285.  Given the context in which this avoidance action was withdrawn from and remanded back to this Court, Mr. Cohen's antecedent debt defenses are not subject to "reconsideration" before this Court.

### C.   Each Of Mr. Cohen's Contentions Regarding Antecedent Debt Are Without Merit

Even if this Court were inclined to consider the contentions raised again by Mr. Cohen in the JPTO regarding antecedent debt, they are all without basis.  As he argued before to the District Court, Mr. Cohen contends that he received the Avoidable Transfers for value within the meaning of Section 548(c), and seeks offsets in the form of common-law claims for damages arising out of:

- taxes paid on fictitious profits and not recovered;

- his loss of investment opportunity for principal invested with BLMIS and prejudgment interest on any claims pursuant to New York Civil Practice Law and Rules § 5001;

- his claims for securities fraud pursuant to Rule 10b-5 and Section 10b of the Securities Exchange Act of 1934; and

- his claims under New York's Article 8 of the Uniform Commercial Code ("U.C.C.").

*See* JPTO at 9-10 (Contention No. 1).  The District Court has already determined that neither taxes, lost opportunity costs, nor any other claim or remedy Mr. Cohen attempts to tack onto his principal amount is relevant to the Trustee's recovery of the Avoidable Transfers from Mr. Cohen.  *See Greiff*, 476 B.R. at 725 ("those transfers from Madoff Securities to defendants that exceeded the return of defendants' principal, *i.e.*, that constituted profits, were not 'for value'").  Thus, each of Mr. Cohen's repackaged arguments fail as a matter of law.

Unlike an ordinary bankruptcy case, a SIPA liquidation preserves and protects the customer property estate, which estate has priority over the general bankruptcy estate.  *See In re Weis Sec., Inc.,* No. 73 Civ. 2332 (RB), 1976 WL 820, at *6 (S.D.N.Y. Aug. 2, 1976).  Each of

these estates has distinct characteristics and purposes. *See* 15 U.S.C. § 78fff-2(c)(1); *Net Equity Decision*, 654 F.3d at 233; *Rosenman*, 395 F. App'x. at 768. The customer property estate is composed of customer property (as defined in SIPA)[17] held by the debtor, including recovered assets, which are earmarked to satisfy customers' net equity claims. *See* 15 U.S.C. § 78fff-2(c)(1). Customers receive priority in the allocation and distribution of "customer property" and share ratably in the customer property fund. *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006). By contrast, the general estate is made up of the debtor's assets available to satisfy the claims of general creditors. *See In re Adler Coleman Clearing Corp.*, 195 B.R. at 270. Customer property is not available to satisfy general creditors' claims unless and until <u>all</u> customers' net equity claims, and the other categories of obligations to which customer property may be properly allocated pursuant to SIPA § 78fff-2(c)(1), have been fully satisfied. *Id.* Moreover, governing law is clear that even a valid claim for damages cannot be paid out of the customer property fund.[18] Even if ultimately allowed, such a claim would be recoverable only from the general estate because to allow defendants like Mr. Cohen "to retain

---

[17] *See* 15 U.S.C. § 78lll(4); *Rosenman*, 395 F. App'x at 768; *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996). To maximize the customer property fund, a SIPA trustee, among other things, may avoid fraudulent transfers under Section 548(a) of the Bankruptcy Code, recover such transfers or their value under Section 550(a) and distribute such property to the customers of the debtor to the extent of their net equity claims. *See* 15 U.S.C.§78fff(a)(1)(B); *SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569, 573-74 (3d Cir. 1977); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1986); *Greiff*, 476 B.R. at 727.

[18] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 454 B.R. 285, 297 n.17 (Bankr. S.D.N.Y. 2011) (holding that "claims for damages resulting from a broker's misrepresentations, fraud or breach of contract are not protected [by SIPA]. Even if it is assumed that [defendants'] losses were caused by fraud, breach of contract, or a similar theory," these claims are properly asserted as general creditor claims to be paid from the general estate) (internal citation omitted); *see also In re Weis Sec., Inc.*, 1976 WL 820 at *2-3 (while SIPA does not contain anti-fraud provisions, claims for Section 10(b) violations, which are both statutory and implied tort liabilities, are to be satisfied out of the general estate as are claims for improper margining under Section 7(c) of the Securities Exchange Act of 1934)*; see also SEC v. JNT Investors, Inc.*, No. 72 Civ. 681 (EJR), 1978 WL 1137, at *1-2 (S.D.N.Y. Feb. 9, 1978) (customer claims for fraud, breach of contract, conversion or rescission are not customer claims within the meaning of SIPA); *SEC v. S. J. Salmon & Co.*, 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974) (finding that a claim for fraudulent inducement and rescission is not a customer claim under SIPA but may be brought as a fraud claim by a general creditor to be satisfied out of the general estate, not the single and separate fund).

profits paid out of customer property . . .would conflict with the priority system established

under SIPA by equating net equity and general creditor claims." *Antecedent Debt Decision,* 499

B.R. at 423 (quoting *Greiff*, 476 B.R. at 727-28).

### 1.    Taxes May Not Be Considered As Part of Value Calculation

This Court already found that including taxes paid on fictitious gains in the calculation of

value under Section 548(c) would be inconsistent with the approved manner for calculating net

equity when it stated that "the withdrawal of the money to pay taxes the Defendants never should

have had to pay is not a defense to the fraudulent transfer claims." *Picard v. The Estate*

*(Succession) of Doris Igoin (In re Madoff Sec.)*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015)

(citing *Donell v. Kowell*, 533 F.3d 762, 778–79 (9th Cir. 2008), *cert. denied*, 555 U.S. 1047

(2008)).

In fact, courts routinely "decline to permit good faith investors to claim offsets for taxes

or other expenses paid in connection with receipt and management of income from a Ponzi

scheme." *Donell*, 533 F.3d at 779.[19]   In *Donell*, an action involving a Ponzi scheme, the receiver

brought an avoidance action against an investor, Robert Kowell, seeking to disgorge Kowell's

profits as fraudulent transfers.  *Id.*  Kowell argued that "even if he is liable to return amounts in

excess of his initial outlay, he should be permitted to offset this liability by amounts paid as

income taxes on those gains, bank transfer fees, and other expenses." *Id.* at 778.  The Ninth

---

[19] S*ee also Janvey v. Alguire*, 647 F.3d 585, 602 (5th Cir. 2011) (affirming that taxes could not be offset by fraudulent transfers received); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996) (declining to allow investor to recover tax and interest payments paid out of Ponzi scheme investment, stating that "this case, however, is not ordinary; it arises out of a Ponzi scheme" and "[a]ny recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own. Rather, any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme."); *Wing v. Dockstader*, No. 2:08 Civ. 776 (BVD), 2010 WL 5020959, at *7 (D. Utah 2010) (rejecting defendants' request to offset income taxes paid on fraudulent transfers, holding that "allowing offsets would create problems of equity because any amount offset, which would differ based on the financial situation of each defendant, would come at the expense of other investors."); *S.E.C. v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 438-39 (S.D.N.Y. 2009) *and aff'd in part sub nom. S.E.C. v. Rosenthal*, 426 F. App'x 1 (2d Cir. 2011) (declining to grant defendants any credit for taxes they may have paid for profits in scheme).

Circuit rejected this argument, finding that, not only did Kowell fail to cite to any authority in support of his position, but to offset his required tax payments would create a slippery slope for other mandatory expenses Kowell had to pay, such as bank transfer fees or fund management fees. *Id.* The Ninth Circuit explained, "There is simply no principle by which to limit such offsets; one could argue that every purchase made with the gains from the scheme would not have been made 'but for' receipt of that money. If each net winner could shield his gains in their entirety in this manner . . . the multitude of victims who lost their entire investment would receive no recovery." *Id.* at 779. As a result, Mr. Cohen is "in the same position as many other Madoff victims who paid taxes on fictitious profits, and then were sued by the Trustee as net winners," and he is not entitled, as a matter of law, to any offsets for any taxes that he might have paid in connection with the Account. *Igoin,* 525 B.R. at 885 n. 16.

### 2. Mr. Cohen Is Not Entitled To Lost Opportunity Costs Or Prejudgment Interest

The District Court has determined that Mr. Cohen and other BLMIS customers are not entitled to lost opportunity costs or prejudgment interest. First, the District Court explained that SIPA "allows claims against the customer property estate only to the extent they are ascertainable from the debtor's books and records, a requirement defendants' damages claims do not and cannot meet, as each defendant's lost opportunity costs and out-of-pocket expenses would not be reflected in Madoff Securities' records." *Antecedent Debt Decision,* 499 B.R. at 424 (citing SIPA § 78fff-2(b)). Second, in addressing claims for prejudgment interest, the District Court stated that "even where courts have recognized claims against the bankruptcy estate to the extent of principal invested, they have nonetheless rejected claims for interest in excess of principal." *Id.* at 422. The District Court explained that "[t]his is because it is a generally recognized principle that, where defendants seek rescission and have received full

- 23 -

repayment on the principal invested, they have no freestanding interest claim." *Id.* In reaching

its decision, the District Court relied on *In re Bayou Grp., LLC*, which makes clear that "[t]he

pre-judgment interest remedy does not provide an independent cause of action that accrues to

Appellants' benefit at the moment of redemption." 439 B.R. 284, 337 (S.D.N.Y. 2010) ("*Bayou

IV*"). Rather, prejudgment interest "is a make-whole remedy ordered by the Court once a final

judgment for a sum certain is entered, *see* N.Y. C.P.L.R. § 5001." *Bayou IV* at 337. Even then,

given that defendants like Mr. Cohen "collected the debt owed them—their initial investment . . .

there is no sum upon which pre-judgment interest could attach." *Id.* Accordingly, Mr. Cohen is

not entitled to either lost opportunity damages or prejudgment interest.

### 3.    Securities Fraud Claims Do Not Provide Value

Mr. Cohen does not have the right to assert offsets for securities fraud claims brought

under Rule 10b-5 and Section 10b of the Exchange Act. The District Court previously found

that because "such claims cannot provide value as against the Madoff Securities customer

property estate under SIPA, [the court does not need to decide] whether defendants have a claim

for damages under such theories or ancillary issues such as whether the statute of limitations has

run on these claims." *Antecedent Debt Decision,* 499 B.R. at 422, n.6. Indeed, the statute of

limitations has, in fact, already run for Mr. Cohen's claims under Section 10b of the Exchange

Act and Rule 10b-5. *See e.g., Domenikos v. Roth*, 288 F. App'x 718, 720 (2d Cir. 2008)

("Section 804(b) of SOX extended the limitations period for securities fraud actions to the lesser

of two years from discovery of the fraud or five years from the date of the fraud."); *Sedona Corp.

v. Ladenburg Thalman & Co.*, No. 03 Civ. 3120 (LTS), 2005 WL 1902780, at *7 (S.D.N.Y. Aug.

9, 2005) (same).

4.        The U.C.C. Does Not Apply To The Trustee's Avoidance Proceedings

Mr. Cohen also cannot use purported claims under the U.C.C. to reduce his avoidance

liability to the Trustee.  Mr. Cohen and other defendants previously raised this argument in their

underlying papers in connection with the *Antecedent Debt Decision.*  While the District Court

did not explicitly address the U.C.C. arguments in the *Antecedent Debt Decision*, it could not

have reached its decision without implicitly rejecting the arguments.  *See, e.g., Camps*

*Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 29 606 (1997) (Scalia J.,

dissenting) (observing that counsel in an earlier case had unquestionably raised an argument in

its briefs and during oral argument, "and the Court could not have reached the disposition it did

without rejecting it.").  Further, the District Court did reject defendants' arguments that they had

"valid contract claims under state law against Madoff Securities for amounts reported in their

customer brokerage statements."  *Antecedent Debt Decision,* 499 B.R. at 421, n. 4 citing *Greiff,*

476 B.R. at 726 (also holding that defendants do not have enforceable claims for the amounts

reported on their brokerage statements).

In any event, the Bankruptcy Code and SIPA override the U.C.C. if the debtor's affairs

are being administered in an insolvency proceeding.  *See* U.C.C. § 8-503 cmt.1 (2009).  Under

the U.C.C., "applicable insolvency law governs how the various parties having claims against the

firm are treated.  For example, the distributional rules for stockbroker liquidation proceedings

under the Bankruptcy Code and [SIPA] provide that all customer property is distributed pro rata

among all customers."  *Id.*  This comment recognizes that the U.C.C. is state law, and to the

extent it is inconsistent with SIPA, the U.C.C. is preempted under the Supremacy Clause of the

United States Constitution.  *See* U.S. Const., art. VI, cl. 2; *First Fed. Sav. & Loan Ass'n of*

*Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353,

378 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986) (holding that any state law that

is inconsistent with SIPA is preempted under the Supremacy Clause); *see also Amer. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946) ("[F]ederal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors.").  Consequently, Mr. Cohen's federal and state law based contentions wholly fail as a matter of law.

### D.    Other Contentions Raised in Antecedent Debt Briefings Similarly Fail

#### 1.    The Replenishment Credit Method Was Repeatedly Rejected

Mr. Cohen's assertions that the Trustee should be limited to a claim for withdrawals taken during the two-year period reduced by deposits made by Mr. Cohen during the two-year period (*see* JPTO at 10 (Contention No. 2))—a method better known as the Replenishment Credit method—has been repeatedly rejected by this Court and the District Court.  *See, e.g., Antecedent Debt Decision,* 499 B.R. at 427-28; *Omnibus Good Faith Decision,* 531 B.R. at 460.  This Court previously made it clear, "[t]he Trustee's calculation of clawback relies on the Net Investment Method to compute a customer's net equity. He offsets all deposits and withdrawals during the life of the account, but he cannot recover more than the amount transferred during the two years preceding the filing date."  *Omnibus Good Faith Decision,* 531 B.R. at 460.  The District Court reiterated this two-step process of calculating fraudulent transfer liability in an avoidance action as follows: (i) "First, amounts transferred by Madoff Securities to a given defendant *at any time* are netted against the amounts invested by that defendant in Madoff Securities *at any time*" and (ii) "Second, if the amount transferred…exceeds that amount invested, the Trustee may recover these net profits… to the extent that such monies were transferred to that defendant in the two years prior."  *Greiff,* 476 B.R. at 729 (emphasis added).

Furthermore, this Court specifically rejected a similar challenge previously, in which defendants argued that the Trustee violated the statutory reach-back period by netting fresh deposits against pre-reach-back withdrawals in determining the amount Trustee can avoid under

Section 548(a)(1)(A).  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, (In re Madoff Sec.),* 522 B.R. 41, 54 (Bankr. S.D.N.Y. 2014) (citing *Antecedent Debt Decision*, 499 B.R. at 426–27).  The District Court rejected the defendants' arguments, explaining that "[j]ust as defendants are entitled to net-equity claims for amounts of principal invested before the reach-back period that they never withdrew, so too must withdrawals before the reach-back period be considered to determine whether a given transfer in fact compensated a given defendant for a claim it would otherwise have had." *Id.* at 427.  Mr. Cohen's contention as to the Trustee's fraudulent transfer liability calculation simply fails.

### 2.   The Trustee Is Not Required To Account For Time Value of Money

Similar to Mr. Cohen's other antecedent debt-related contentions, his argument that he and other defendants should be compensated for the time value of money (*see* JPTO at 10 (Contention No. 7)) was previously raised in the underlying papers related to the *Antecedent Debt Decision*, to which Mr. Cohen was a party.[20]  While the District Court declined to address such arguments because it did not withdraw the reference with respect to that question,[21] this issue was fully adjudicated in relation to the Trustee's *Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages*, in which objectors argued that the Trustee should take into account the effects of inflation, constant dollar, or time value of money when calculating "value" in terms of customers' net equity claims.  This Court held that the Trustee was not required to make adjustments to customer claims to account for any form of

---

[20] *See* Consolidated Memorandum of Law in Support of Motion to Dismiss Regarding Antecedent Debt Issues on Behalf of Withdrawal Defendants As Ordered By The Court on May 12, 2012, at 6-10, *In re Madoff Sec.,* No. 12 MC 00115 (JSR) (S.D.N.Y. June 25, 2012), ECF No. 199 (Defendants, including Mr. Cohen, argued that they were entitled to interest in addition to principal, and that their net-equity interests require an adjustment for the loss of time value of money.).

[21] *See Antecedent Debt Decision,* 499 B.R. at 422, n. 5 (citing *Greiff,* 476 B.R. at 727, n.10).

time-based damages.  *See In re Madoff Sec.*, 496 B.R. 744, 761 (Bankr. S.D.N.Y. 2013).

In February 2015, the Second Circuit affirmed this Court's ruling on a direct appeal,

explaining that "[u]nder SIPA, Claimants' net equity claims cannot be adjusted to reflect

inflation."  *In re Madoff Sec.*, 779 F.3d 74, 81 (2d Cir. 2015) ("*Time-Based Damages Decision*").

The Second Circuit concluded:

> The purpose of determining net equity under SIPA is to facilitate
> the proportional distribution of customer property actually held by
> the broker, not to restore to customers the value of the property
> that they originally invested. We thus previously concluded that in
> this case net equity could not be based on fictitious customer
> statements but instead should be determined based on customers'
> actual deposits and withdrawals. These deposits, net withdrawals,
> constitute customer property here. Under SIPA, Claimants' net
> equity claims cannot be adjusted to reflect inflation.

*Id.* (internal citation omitted).  While the Second Circuit addressed the calculation of net equity

in the claims context, the calculation of net equity is the same in both the claims and avoidance

context.  *See Antecedent Debt Decision,* 499 B.R. at 420 ("[A] customer's net equity and the

amounts sought in avoidance and recovery proceedings (assuming the customer's good faith) are

two sides of the same coin.").[22]

### E.    There Has Been No Violation Of Mr. Cohen's Due Process Rights

The very contentions that Mr. Cohen asserts regarding due process violations (*see* JPTO

at 10 (Contention Nos. 5 & 6)) were previously raised to—and rejected by—this Court.  This

Court concluded, "the Trustee is not a governmental actor, but even if he was, his computation of

the defendants' clawback exposure is neither 'arbitrary' nor 'outrageous,' and does not give rise

to a claim for violation of due process."  *Omnibus Good Faith Decision,* 531 B.R. at 460-61

(citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845 (1998) ("the touchstone of due process

---

[22] The Supreme Court denied the petition for *certiorari* to review the Second Circuit's decision.  *Peshkin v. Picard*,
No. 14A1099, 2015 WL 4468041 (U.S. Oct. 5, 2015).

is protection of the individual against arbitrary action of government"); *Rochin v. California,* 342
U.S. 165, 172 (1952) (conduct that "shocks the conscience" violates due process); *Natale v.
Town of Ridgefield,* 170 F.3d 258, 259 (2d Cir.1999) (only a gross abuse of governmental
authority can violate the substantive standards of the due process clause)).  This argument was
previously raised in the briefings related to the District Court's *Antecedent Debt Decision.*
While the due process challenge was not specifically addressed, the District Court "could not
have reached [its] conclusion in the *Antecedent Debt Decision* without implicitly rejecting it."
*Omnibus Good Faith Decision,* 531 B.R. at 461 (citing *Camps Newfound/Owatonna, Inc.,* 520
U.S. at 606).

Likewise, Mr. Cohen's spurious arguments regarding the Trustee's compensation fail.
This Court already specifically dismissed these claims, holding that "the trustee has no financial
stake in the outcome of any litigation he pursues. He and his firm are entitled to reasonable
compensation like any other trustee and his counsel."  *Omnibus Good Faith Decision,* 531 B.R.
at 459.  This Court further stated, "Here, the Trustee is not the adjudicator of the claims he
brings. He investigates the claims and brings litigation, but a judge decides the outcome. . ." *Id.*
at 460.  *See also* SIPA § 78eee(b)(5)(A) ("The court shall grant reasonable compensation for
services rendered and reimbursement for proper costs and expenses incurred ... by a trustee, and
by the attorney for such a trustee, in connection with a liquidation proceeding."); 11 U.S.C. §
330(a)(1) (authorizing bankruptcy court to award "reasonable compensation for actual, necessary
services" and "reimbursement for actual, necessary expenses," *inter alia,* to the trustee and his
professionals).  Accordingly, Mr. Cohen's contentions relating to purported due process
violations have no merit.

### III.   Mr. Cohen Has Waived His Additional Contentions

On October 14, 2015, during the trial in this Adversary Proceeding, Mr. Cohen asserted

at least two additional contentions, namely that (1) "the obligations that were owed by Madoff to

Mr. Cohen . . . provided a defense under [Section] 548(c)," and (2) that Mr. Cohen is entitled to

reimbursement of legal fees "as consequential damages as a result of the fraud" pursuant to the

"wrongful act doctrine."  Trial Transcript at 12:5-12; 19:12-17.  However, neither contention was

included in the Second Revised Joint Pretrial Order that the Trustee and Mr. Cohen jointly

prepared and executed on October 8, 2015.   Consequently, Mr. Cohen has waived these

additional contentions.  A final pre-trial order "is not to be changed lightly" and "[t]hat which is

not alleged in the Pre–Trial Order is generally deemed waived."  *Vogelfang v. Riverhead Cnty.*

*Jail*, No. 04 Civ. 1727 (SJF) (AKT), 2012 WL 1450560, at *11 (E.D.N.Y. Apr. 19, 2012) (citing

*Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01 Civ. 3796 (PKL),

2005 WL 1026515, at *6 (S.D.N.Y. May 2, 2005)).  *See also Walling v. Holman,* 859 F.2d 79,

82 (2d Cir. 1988) (finding a party waived a counterclaim alleged in its Answer but not included

on the pretrial order or in the requested jury charge).

In any event, Mr. Cohen's additional contentions have no bearing here.  The District

Court rejected in *Greiff,* and again in the *Antecedent Debt Decision,* that BLMIS's account

statements constituted binding, enforceable obligations of BLMIS to its customers, such that the

amounts reported thereon are "antecedent debts" that BLMIS owed to its customers.  In the

*Antecedent Debt Decision*, the District Court unequivocally stated "the Court rejects defendants'

contention that Madoff Securities' pre-reach-back-period account statements constitute binding

obligations of Madoff Securities to its customers that the Trustee must avoid."  499 B.R. at 421,

n.4.  Likewise in *Greiff,* the Court found that the amounts reported on account statements were

invalid and entirely unenforceable.  476 B.R. at 726.  Such amounts could therefore not create

valid obligations used to offset liability.  *Id.* The District Court stated:

> Any entitlement defendants had to a return on their investment,
> then, depended on a representation that Madoff Securities had in
> fact generated a profit. The complaints allege that Madoff
> Securities' representations in this regard were wholly fraudulent.
> Thus, defendants, in effect, ask the Court to enforce the fraud on
> the ground that the vehicle of this particular Ponzi scheme, in
> contrast to others, styled itself as a stockbroker. Such a distinction
> pays only lip service to the underlying realities of the Ponzi
> scheme, and the Court rejects it.

*Id.* at 726.

As for Mr. Cohen's contention that he is entitled to reimbursement of his legal fees as

consequential damages under the purported wrongful act doctrine—which is not applicable

here—the District Court already ruled that to the extent that Mr. Cohen's damages claim

"allow[s] [him] to withhold funds beyond [his] net-equity share of customer property," he is

"making those damages claims against the customer property estate" and "allowing such claims

to be drawn out of the customer property estate would violate SIPA.  It is for this reason that

only a defendant's investment of principal may count as 'value' with respect to the customer

property estate for purposes of section 548(c)." *Antecedent Debt Decision,* 499 B.R. at 424,

(citing *Greiff,* 476 B.R. at 728) ("[W]hen determining whether a transferee provides value, SIPA

requires consideration not only of whether the transfer diminishes the resources available for

creditors generally, but also whether it depletes the resources available for the satisfaction of

customers' net equity claims and other priority claims.").

Mr. Cohen's obligations and legal fees arguments amount to nothing more than claims

arising under federal or state law, which the District Court previously rejected.  *See Antecedent

Debt Decision,* 499 B.R. at 424 ("[T]o the extent that payment of defendants' state and federal

law claims would discharge an antecedent debt, that debt runs against Madoff Securities' general

estate, not the customer property estate, and therefore cannot be the basis of the retention of

customer property under section 548(c).").  As a result, even if Mr. Cohen's additional

contentions have not been waived, which they have, they must be rejected.

## IV.    Conclusion

Given the record now before this Court, the Trustee has established: (a) all of the required

elements, under Section 548(a)(1)(A) of the Bankruptcy Code, to avoid the Avoidable Transfers;

and (b) all of the required elements, under Section 550(a) of the Bankruptcy Code, entitling the

Trustee to recover the Avoidable Transfers, or the value thereof, from Mr. Cohen.  Indeed, Mr.

Cohen specifically stipulated to all facts required to substantiate these claims.  Further, each of

the legal contentions raised by Mr. Cohen in an attempt to eliminate or decrease his liability to

the Trustee fails as a matter of law.  The Trustee respectfully requests that this Court report and

recommend to the District Court that an order be entered avoiding the Avoidable Transfers and

judgment be entered against Mr. Cohen in favor of the Trustee in the amount of $1,143,461.


Dated: November 12, 2015
       New York, New York

                                        **BAKER & HOSTETLER LLP**


                                        By: /s/ *Nicholas J. Cremona*
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone:  212.589.4200
                                        Facsimile:  212.589.4201
                                        David J. Sheehan
                                        Email:  dsheehan@bakerlaw.com
                                        Nicholas J. Cremona
                                        Email:  ncremona@bakerlaw.com
                                        Keith R. Murphy
                                        Email:  kmurphy@bakerlaw.com
                                        Ona T. Wang
                                        Email:  owang@bakerlaw.com

Torello H. Calvani
Email:  tcalvani@bakerlaw.com

and

1900 East Ninth Street
Cleveland, Ohio 44114
Telephone:  216.621.0200
Facsimile:  216.696.0740
James H. Rollinson
Email:  jrollinson@bakerlaw.com

*Attorneys for Plaintiff Irving H. Picard,
Trustee for the liquidation of Bernard L.
Madoff Investment Securities LLC and the
consolidated estate of Bernard L. Madoff*