**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------------------X

SECURITIES INVESTOR PROTECTION     :
CORPORATION,     :
     :   Adv. Pro. No. 08-1789
(SMB)
     Plaintiff,     :
     :   SIPA LIQUIDATION
   v.     :
     :   (substantively consolidated)
BERNARD L. MADOFF INVESTMENT SECURITIES,     :
LLC     :
     :
     Defendant.     :

------------------------------------------------------------------------------X

     :
In re:     :
     :
BERNARD MADOFF,     :
     :
     Debtor.     :

------------------------------------------------------------------------------X

     :
IRVING H. PICARD, Trustee for the Liquidation of     :
Bernard L. Madoff Investment Securities LLC,     :   Adv. No. 10-04311(SMB)
     :
     Plaintiff,     :
     :
   v.     :
     :
ANDREW H. COHEN,     :
     :
     Defendant.     :

------------------------------------------------------------------------------X

**MEMORANDUM OF LAW (PROVISIONAL)**
**OF INTERVENOR-CUSTOMERS ON VALUE DEFENSE ISSUES**

*Filed by*

Richard A. Kirby
Laura K. Clinton
BAKER & MCKENZIE LLP
815 Connecticut Avenue
Washington D.C. 20006
(202) 452-7020 (Telephone)
*on behalf of undersigned counsel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................... 1

ARGUMENT ............................................................................................................................... 5

I.    The Section 548(c) Value Defense Is Available to SIPA Avoidance Defendants
      and Operates According to Its Plain Statutory Language. .................................. 5

      A.    Congress did not expand a SIPA trustee's avoidance powers beyond
            those set out in the Bankruptcy Code. .................................................. 6

      B.    Section 548(c) does not conflict with SIPA ........................................... 7

            1.    The Second Circuit has confirmed that Section 8(c)(3) is merely
                  a standing provision, not an equitable expansion of avoidance
                  powers. .................................................................................... 8

            2.    SIPA's priority claim distribution has no bearing on avoidance
                  defenses. ................................................................................ 11

II.   Brokerage Customers Are Entitled to Retain All Transfers Made Under Their
      Brokerage Agreements Where the Trustee Fails to Avoid the Broker's Existing
      Obligations. ................................................................................................... 13

      A.    Where a transfer was supported by the debtor's obligation to a transferee,
            a trustee must avoid the underlying obligation in order to recover the
            transfer. ............................................................................................ 15

      B.    The Trustee lacks standing to invoke common law to void Madoff's
            obligations to defendants—leaving the Trustee only with the remedy
            provided in the Bankruptcy Code. .................................................... 18

            1.    A fraudulent securities contract is voidable solely at the option of
                  the innocent party. ............................................................... 18

            2.    The doctrine of in pari delicto bars the Trustee from invoking
                  common law principles to evade the broker's contractual
                  obligations to customers. ...................................................... 21

      C.    Mr. Cohen has a complete defense to avoidance because the Trustee
            failed to avoid the debtor's obligations, and each transfer satisfied such
            unavoided obligations. ....................................................................... 22

III.  Customers Also Have Federal and State Law Rights to Retain Amounts in
      Satisfaction of Their Tort Claims for Damages, Interest, and Consequential
      Damages.......................................................................................................... 23

      A.    Mr. Cohen held federal securities fraud claims against Madoff Securities
            at the time of the transfers, which are valued by their available remedies. ........ 23

      B.    Mr. Cohen's state fraud and breach of fiduciary duty claims against
            Madoff Securities are also value for purposes of Section 548(c). ..................... 26

IV.   At a Minimum, Customers Are Entitled to Retain the Real Value of the Property
      They Deposited with Madoff Securities Measured at the Time of the Transfer,
      Which Is Greater than the Face Amount of Earlier Deposits. ........................... 28

# TABLE OF CONTENTS

(continued)

**Page**

A.  Value under Section 548(c) is what customers lost—here, far more valuable dollars than the face value of the transfer.............................................. 29

B.  Both the Supreme Court and the Second Circuit have repeatedly required inflation adjustments when a statute is silent on the issue.................................. 31

V.  Ponzi Scheme Cases That Do Not Involve Brokerage Customers Are Irrelevant. .......... 32

VI.  Where Customers Made Deposits to Their Accounts During the Two-Year Reach-Back Period, the Court Must Credit the New Value Added to the Estate. ........... 36

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*105 E. Second St. Assocs. v. Bobrow*,
573 N.Y.S.2d 503 (N.Y. App. Div. 1991) ............................................................26

*In re Adelphia Communics. Corp.*,
2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ...............................................37

*In re All-Type Printing, Inc.*,
274 B.R. 316 (Bankr. D. Conn. 2002) .............................................................16, 17

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999) ............................................................................25

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..............................................................................................31

*American Gen. Ins. Co. v. Equitable Gen. Co.*,
493 F. Supp. 721 (E.D. Va. 1980) ........................................................................25

*Asarco LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) .............................................................................30

*In re Asia Global Crossing, Ltd.*,
333 B.R. 199 (Bankr. S.D.N.Y. 2005).................................................................15

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
18 N.Y.3d 341 (N.Y. 2011) .................................................................................26

*Axel Johnson, Inc. v. Arthur Andersen & Co.*,
830 F. Supp. 204 (S.D.N.Y. 1993)........................................................................21

*Bass v. Janney Montgomery Scott, Inc.*,
152 F. Appx. 456 (6th Cir. 2005)..........................................................................25

*In re Bassett*,
221 B.R. 49 (Bankr. D. Conn. 1998) .....................................................................38

*In re Bayou Group, LLC*,
439 B.R. 284 (S.D.N.Y. 2010)..............................................................................36

*In re Bennett Funding Group, Inc.*,
1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999) ...............................23

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Bennett Funding Grp., Inc.*,
    253 B.R. 316 (Bankr. N.D.N.Y. 2000) ................................................33

*In re Bernard L. Madoff Inv. Secs. LLC*,
    654 F.3d 229 (2d Cir. 2011)..............................................2, 12, 29

*Big Apple Car, Inc. v. City of New York*,
    611 N.Y.S.2d 533 (N.Y. App. Div. 1994) ........................................26, 28

*Boston Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) ...............................................36

*Brick v. Dominion Mortg. & Realty Trust*,
    442 F. Supp. 283 (W.D.N.Y. 1977) ...........................................25

*Brown v. Gardner*,
    513 U.S. 115 (1994).........................................................10

*Buffalo Forge Co. v. Ogden Corp.*,
    717 F.2d 757 (2d Cir. 1983).............................................19, 20

*Butner v. United States*,
    440 U.S. 48 (1979).....................................................10, 11, 36

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997) .......................................................10

*Cant v. AG Becker & Co., Inc.*,
    384 F. Supp. 814 (N.D. Ill. 1974) ........................................20, 25

*Cary Oil Co. v. MG Ref'g. & Mktg., Inc.*,
    230 F. Supp. 2d 439 (S.D.N.Y. 2002)..........................................19

*In re Centennial Textiles, Inc.*,
    220 B.R. 165 (Bankr. S.D.N.Y. 1998)..........................................37

*In re Central Ill. Energy Coop.*,
    526 B.R. 786 (Bankr. C.D. Ill. 2015).......................................16, 22

*CFTC v. Walsh*,
    17 N.Y.3d 162 (2011) .......................................................36

*Chen v. New Trend Apparel, Inc.*,
    8 F. Supp. 3d 406 (S.D.N.Y. 2014)...........................................29

*In re Chomakos*,
    69 F.3d 769 (6th Cir. 1995) ................................................30

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Churchill Mortg. Inv. Corp.*,
  256 B.R. 664 (S.D.N.Y. 2000) ...................................................................... 29, 35

*In re Clarkston*,
  387 B.R. 882 (Bankr. S.D. Fla. 2008) .......................................................... 37

*In re Clayton Magazines, Inc.*,
  77 F.2d 852 (2d Cir. 1935) ............................................................................. 38

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992) ........................................................................... 9

*In re Cybridge Corp.*,
  312 B.R. 262 (D.N.J. 2004) ............................................................................ 37

*Daly v. Parete (In re Carrozzella & Richardson)*,
  270 B.R. 92 (Bankr. D. Conn. 2001) ............................................................. 36

*DeLong Corp. v. Morrison-Knudsen Co., Inc.*,
  244 N.Y.S.2d 859 (N.Y. App. Div. 1963) ...................................................... 27

*Doca v. Marina Mercante Nicaraguense, S.A.*,
  634 F.2d 30 (2d Cir. 1980) ............................................................................. 32

*Donell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) .......................................................................... 34

*Donovan v. Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985) ......................................................................... 26

*Drasner v. Thomson McKinnon Sec, Inc.*,
  433 F. Supp. 485 (S.D.N.Y. 1977) ................................................................. 19

*In re Estate of Newhoff*,
  435 N.Y.S.2d 632 (N.Y. Surr. Ct. Nassau Cty. 1980) ................................... 27

*FDIC v. Giammettei*,
  34 F.3d 51 (2d Cir. 1994) ............................................................................... 19

*In re Financial Federated Title & Trust*,
  309 F.3d 1325 (11th Cir. 2002) ...................................................................... 29

*Finn v. Alliance Bank*,
  860 N.W.2d 638 (Minn. 2015) ....................................................................... 33

*In re First Commercial Mgmt. Group, Inc.*,
  279 B.R. 230 (Bankr. N.D. Ill .2002) ............................................................ 29

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Foundation Ventures, LLC v. F2G, Ltd.,*
2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) ......................................................19

*Fourco Glass Co. v. Transmirra Prods. Corp.,*
353 U.S. 222 (1957) ................................................................................................................9

*Freeman v. Marine Midland Bank-New York,*
419 F. Supp. 440 (E.D.N.Y. 1976) ......................................................................................19

*In re Gober,*
100 F.3d 1195 (5th Cir. 1998) .............................................................................................38

*Grippo v. Perazzo,*
357 F.3d 1218 (11th Cir. 2004) ...........................................................................................24

*In re Hannover,*
310 F.3d 796 (5th Cir. 2002) ...............................................................................................29

*HBE Leasing v. Frank,*
48 F.3d 623 (2d Cir. 1995) ..................................................................................................37

*In re HDD Rotary Sales, LLC,*
512 B.R. 877 (Bankr. S.D. Tex. 2014) ................................................................................16

*In re Hedged Invs. Assocs., Inc.,*
84 F.3d 1286 (10th Cir. 1996) .............................................................................................34

*In re Hedged-Inv. Assocs., Inc.,*
48 F.3d 470 (10th Cir. 1995) ...............................................................................................33

*In re Incentium, LLC,*
473 B.R. 264 (Bankr. E.D. Tenn. 2012) ..............................................................................16

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,*
534 U.S. 124 (2001) .............................................................................................................10

*In re Jackson,*
318 B.R. 5 (D.N.H. 2004) ....................................................................................................37

*In re James River Coal Co.,*
360 B.R. 139 (Bankr. E.D. Va. 2007) .................................................................................15

*Janvey v. Brown,*
767 F.3d 430 (5th Cir. 2014) .........................................................................................34, 35

*Jones & Laughlin Steel Corp. v. Pfeifer,*
462 U.S. 523 (1983) .............................................................................................................31

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Kardon v. National Gypsum Co.*,
    69 F. Supp. 512 (E.D. Pa. 1946) ................................................................20

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
    130 S. Ct. 2433 (2010) ............................................................................9

*Kingsley v. Wetzel*,
    518 F.3d 874 (11th Cir. 2008) .................................................................37

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ............................................................................21

*Law v. Siegel*,
    134 S. Ct. 1188 (2014) ...........................................................................10

*In re Lehman Bros. Holdings Inc.*,
    469 BR 415 (Bankr. S.D.N.Y. 2012) .........................................................15

*Lowenbraun v. L.F. Rothschild*,
    685 F. Supp. 336 (S.D.N.Y. 1988)..............................................................26

*Lutz v. Chitwood (In re Donahue Secs., Inc.)*,
    304 B.R. 797 (Bankr. S.D. Ohio 2003)........................................................9

*In re MacMenamin's Grill Ltd.*,
    450 B.R. 414 (Bankr. S.D.N.Y. 2011) ........................................................15

*Mallis v. Bankers Trust Co.*,
    717 F.2d 683 (2d Cir. 1983).....................................................................27

*Marshall v. Picard*,
    740 F.3d 81 (2d Cir. 2014).......................................................................8

*McRaith v. BDO Seidman, LLP*,
    909 NE 2d 310 (Ill. App. Ct. 2009) ...........................................................34

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)................................................................................24

*Merrill v. Abbott (In re Independent Clearing House Co.)*,
    77 B.R. 843 (D. Utah 1987) ............................................................... 36, 38

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)..........................................................................19, 20

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992)...............................................................................9

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Morris Communications NC, Inc.*,
  914 F.2d 458 (4th Cir. 1990) ............................................. 30

*Morton v. Mancari*,
  417 U.S. 535 (1974)........................................................ 10

*In re Murel Holding Corp.*,
  75 F.2d 941 (2d Cir. 1935)................................................ 32

*In re National Gas Distribs., LLC*,
  412 B.R. 758 (Bankr. E.D.N.C. 2009) ................................. 17

*In re Nirvana Rest.*,
  337 B.R. 495 (Bankr. S.D.N.Y. 2006) ................................. 17

*NML Capital v. Republic of Argentina*,
  17 N.Y.3d 250 (2011) ..................................................... 27

*O'Melveny & Myers v. FDIC*,
  512 U.S. 79 (1994).......................................................... 10

*Official Comm. v. Conciera Sabrina*,
  195 B.R. 602 (Bankr. M.D. Pa. 1996) ................................. 30

*Oliveri v. Delta S.S. Lines, Inc.*,
  849 F.2d 742 (2d Cir. 1988).............................................. 32

*In re Patts*,
  470 B.R. 234 (Bankr. D. Mass. 2012) ................................. 37

*Pearlstein v. Scudder & German*,
  295 F. Supp. 1197 (S.D.N.Y. 1968).................................... 19

*Pearlstein v. Scudder & German*,
  429 F.2d 1136 (2d Cir. 1970)............................................ 19

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014).......................................7, 8, 9,13

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)........................................ *passim*

*Picard v. HSBC Bank PLC*,
  454 B.R. 25 (Bankr. S.D.N.Y. 2011).............................6, 21, 22

*Picard v. Ida Fishman Rev. Trust*,
  773 F.3d 411 (2d Cir. 2014)........................................... *passim*

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Picard v. JPMorgan Chase Bank & Co.*,
   721 F.3d 54 (2d Cir. 2013)..................................................................................2, 20, 21

*Picard v. Merkin*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...........................................................................8

*Procter & Gamble Distrib. Co. v. Sherman*,
   2 F.2d 165 (S.D.N.Y. 1924)...........................................................................................32

*Purcell v. Long Island Daily Press Publ'g Co.*,
   9 N.Y.2d 255 (N.Y. 1961) .............................................................................................27

*Randall v. Loftsgaarden*,
   478 U.S. 647, 662–63 (1986) ....................................................................................24, 25

*Randall v. Sorrell*,
   548 U.S. 230 (2006)........................................................................................................31

*Redstone v. Goldman, Sachs & Co.*,
   583 F. Supp. 74 (D. Mass. 1984) .................................................................................35

*Reider v. Arthur Andersen, LLP*,
   784 A.2d 464 (Conn. Super. Ct. 2001) .......................................................................34

*Rolf v. Blyth, Eastman Dillon & Co.*,
   637 F.2d 77 (2d Cir. 1980)......................................................................................24, 25

*Rotella v. Wood*,
   528 U.S. 549 (2000)........................................................................................................38

*RWP Consol., LP v. Salvatore*,
   534 F. Supp. 2d 364 (D. Conn. 2008) .........................................................................20

*In re Sawran*,
   359 B.R. 348 (S.D. Fla. 2007) ......................................................................................37

*Scheve v. Clark*,
   596 F. Supp. 592 (E.D. Mo. 1984)...............................................................................25

*Schnorr v. Schubert*,
   2005 WL 2019878 (W.D. Okla. Aug. 18, 2005) ........................................................24

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ..........................................................................................34

*Schott v. Maidsville Coal Min. P'ship*,
   1979 WL 1245 (S.D.N.Y. Sept. 7, 1979)....................................................................24

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*SEC v. Zandford*,
535 U.S. 813 (2002)...........................................................................................24

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005).................................................................................36

*Shrader v. CSX Transp.*,
70 F.3d 255 (2d Cir. 1995)...................................................................................7

*SIPC v. Bernard L. Madoff Inv. Secs. LLC*,
531 B.R. 439 (Bankr. S.D.N.Y. 2015).............................................................1, 22

*SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.)*,
499 B.R. 416 (S.D.N.Y. 2013)..................................................................... *passim*

*Stevens v. Abbot, Proctor & Paine*,
288 F. Supp. 836 (E.D. Va. 1968) .....................................................................25

*Symbol Tech., Inc. v. Deloitte & Touche, LLP*,
888 N.Y.S.2d 538 (N.Y. Sup. Ct. App. Div. 2d Dep't 2009) .................................21

*Till v. SCS Credit Corp.*,
541 U.S. 465 (2004)...........................................................................................31

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007)...........................................................................................10

*Trichilo v. Secretary of Health & Human Services*,
823 F.2d 702 (2d Cir. 1987)...............................................................................32

*In re TSIC, Inc.*,
428 B.R. 103 (Bankr. D. Del. 2010) ..................................................................17

*United States v. Will*,
449 U.S. 200 (1980)...........................................................................................32

*In re Universal Clearing House Co.*,
60 B.R. 985 (D. Utah 1986)...............................................................................29

*USPS v. Phelps Dodge Refining Corp.*,
950 F. Supp. 504 (E.D.N.Y. 1997) ....................................................................27

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
956 F.2d 1245 (2d Cir. 1992)...............................................................................7

*Visconsi v. Lehman Bros.*,
244 F. Appx. 708 (6th Cir. 2007).......................................................................35

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*,
   821 F. Supp. 212 (S.D.N.Y. 1993).........................................................................25

*In re Whitney*,
   2007 Bankr. LEXIS 2628 (Bankr. D. Md. July 30, 2007).......................................30

*Wolf v. Rand*,
   685 N.Y.S.2d 708 (N.Y. Sup. Ct. App Div. 1999) ................................................27

*In re World Vision Entm't., Inc.*,
   275 B.R. 641 (Bankr. M.D. Fla. 2002) ..................................................................29

*Zeller v. Bogue Elec. Mfg. Corp.*,
   476 F.2d 795 (2d Cir. 1973)...................................................................................25

## STATUTES AND RULES

11 U.S.C. § 541(a)(3).......................................................................................................11

11 U.S.C. § 544(b)(1) ......................................................................................................16

11 U.S.C. § 546(e) ...................................................................................................1, 7, 12

11 U.S.C. § 548(a)(1)......................................................................................5, 15, 17, 22

11 U.S.C. § 548(d)(2) ................................................................................................5, 28

11 U.S.C. § 550(a) .....................................................................................................11, 37

11 U.S.C. § 550(e)(2)......................................................................................................30

11 U.S.C. § 555...............................................................................................................38

11 U.S.C. § 559.................................................................................................................6

11 U.S.C. § 726...............................................................................................................11

15 U.S.C. § 77*l*(a)(2).......................................................................................................24

15 U.S.C. § 78cc(b).................................................................................................. 18, 25

15 U.S.C. § 78fff-1(a)...................................................................................................6, 9

15 U.S.C. § 78fff(b).........................................................................................................9

15 U.S.C. § 78fff-2(c)(1)................................................................................................11

15 U.S.C. § 78fff-2(c)(3)...............................................................................................6, 8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. Civ. P. 54(b) ....................................................................................................7

N.Y. C.P.L.R. § 5001(a) ..............................................................................................27

N.Y. C.P.L.R. § 5004 ...................................................................................................28

New York Uniform Commercial Code, Article 8.........................................................14

Securities Act of 1933
    § 12(a)(2) and 17...................................................................................................24, 25

Securities Exchange Act of 1934
    Rule 10b-5............................................................................................................ *passim*

## <u>SECONDARY AUTHORITIES</u>

18B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure
    § 4478 (2002).........................................................................................................7

5 Collier on Bankruptcy ¶ 548.03[5] .......................................................................29

Restatement (Second) of Trusts...............................................................................26

Restatement (Second) of Contracts .........................................................................24

Restatement (Second) of Torts. ...............................................................................26

Restatement (Third) of Restitution and Unjust Enrichment ...........................................24

## PRELIMINARY STATEMENT

In December 2014, the Second Circuit explicitly held that every transfer made to an innocent Madoff Securities customer constituted a valid "settlement payment" or a payment made "in connection with a securities contract" under Section 546(e) of the Bankruptcy Code. *Picard v. Ida Fishman Rev. Trust*, 773 F.3d 411 (2d Cir. 2014), *cert. denied,* 135 S. Ct. 2858-59 (2015) (the "*Section 546(e) Decision*"). The necessary premise of that holding is that each customer had a legal right to withdraw from his Madoff Securities account any amount up to the total balance reported on the broker's statements and trade confirmations and that these rights limit the Trustee's avoidance claims.[1]

Likewise, Bankruptcy Code Section 548(c) allows the good faith customers of Madoff Securities to retain all amounts that they withdrew from their accounts, to the extent that they gave value to the debtor at the time of the transfers. Value is statutorily defined in Section 548(c) to include the satisfaction of an antecedent debt or legal obligation—which includes the broker's contractual obligation to remit to a customer the amount shown on his account statement. While earlier court rulings refused to enforce this legal right to payment as a valid obligation for purposes of the value defense,[2] the rationale on which those rulings rely is no longer viable. The Second Circuit's holding in the *Section 546(e) Decision* on the nature of the transfers at issue necessarily supersedes all judicial decisions on the subject and controls the characterization of

---

[1]    Customers represented by undersigned counsel moved to intervene in this action. Briefing was completed in November 2015, and the motion is pending. In their motion, customers undertook to conform to the briefing schedule in this adversary proceeding to avoid any delay or prejudice to the parties. Accordingly, this provisional brief is submitted subject to the Court's ruling on customers' motion to intervene or its alternative request for *amicus* status.

[2]    *See SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.)*, 499 B.R. 416 (S.D.N.Y. 2013) (Rakoff, J.) (the "*Antecedent Debt Decision*"); *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012) (Rakoff, J.) (the "*Greiff Ruling*"). *See also SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015).

1

the broker's obligations to its customers in the context of the pending avoidance proceedings. Accordingly, the principles of *stare decisis* and law of the case do not apply.

It is clear error to suggest that a SIPA trustee may simply disregard a broker's state law obligation to a customer if the obligation is a product of the broker's fraud. That conclusion is flatly inconsistent with the Securities Exchange Act of 1934 ("1934 Act"), of which SIPA is a part, and misinterprets controlling precedents. Section 29(b) of the 1934 Act expressly permits an innocent victim of fraud to stand on his contractual rights *even where the contract was procured by the counterparty's fraud.* A SIPA trustee is unable to void a fraudulent contract between a debtor-broker and a customer under the 1934 Act or common law; only the victim of the fraud may do so, a tenet the Second Circuit confirmed in this case in the *JPMorgan* decision.[3] The Trustee's only remedy is to seek formal avoidance of the obligation through the bankruptcy process, with its attendant limitations and protections.

To escape this conclusion, the Trustee relies on cases in which the defendant was an equity investor in a Ponzi scheme vehicle. But these general Ponzi scheme cases are irrelevant to a brokerage customer's avoidance defenses for transfers received in the ordinary course of the broker-customer relationship. An equity investor in a Ponzi scheme has no contractual claim under the securities laws or the Uniform Commercial Code to a distribution at the time of transfer. Likewise, the Second Circuit's earlier *Net Equity Decision*[4] does not address the application of statutory defenses to the Trustee's avoidance claims. Instead, the *Net Equity Decision* concerns only the Trustee's discretion to disregard brokerage statements for the purpose of computing a SIPA net equity claim to be paid from the customer estate. Whatever his

---

[3]   *Picard v. JPMorgan Chase Bank & Co.*, 721 F.3d 54, 58, 63 (2d Cir. 2013), *cert. denied,* 134 S. Ct. 2895 (2014) ("*JPMorgan*"), discussed *infra* at 21–22.

[4]   *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012) (the "*Net Equity Decision*").

authority to calculate net equity claims, a SIPA trustee has no greater powers to avoid a transfer than an ordinary bankruptcy trustee. Where, as here, the Bankruptcy Code provides a specific defense to avoidance, SIPA does not displace it.

As noted, a trustee faced with the kind of massive fraud alleged here has potential recourse. The bankruptcy statute permits the trustee to avoid a debtor's fraudulent obligations under certain circumstances. A trustee's failure to formally avoid an obligation—either by choice or because of a statutory bar—is fatal to his claim for avoidance of transfers made on account of such obligations. In *Cohen*, as in most customer cases, the Trustee chose not to avoid the legal obligations incurred by Madoff Securities to its customers, leaving those obligations intact.[5] Having elected not to pursue avoidance of Madoff Securities' obligations, the Trustee cannot escape the consequences of his choice. Those obligations provide customers a complete defense to the avoidance of the account withdrawals because such transfers were in satisfaction of the broker's existing legal obligation.

This Court—which has the first meaningful opportunity to consider the changed legal landscape—should address the issues directly and hold that the transfers Madoff Securities made to customers were in satisfaction of its existing legal obligations, and thus were given in exchange for value within the meaning of Section 548(c).

In addition, customers like Mr. Cohen held other antecedent debts against the broker as of the time of the transfers. As a victim of a massive admitted fraud, each customer had valid state and federal law tort claims, which are also rights to payment constituting value under Section

---

[5]    This Court dismissed the Trustee's attempt to allege many such claims at the pleading stage. 531 B.R. at 475–79.

548(c).  The Trustee concedes that such claims are valid,[6] but insists that because they are general unsecured claims, their value cannot be credited in the avoidance actions.  In so doing, the Trustee improperly conflates the priority of customer property distribution with avoidance powers.  Section 548(c) draws no distinction regarding the priority of debts or claims for purposes of ascribing "value."  It states simply that value includes an antecedent debt or obligation, measured as of the time of the transfer—long before there was a bankruptcy estate or SIPA proceeding.  There is symmetry between the SIPA priority system for addressing claims against a failed broker-dealer and the Bankruptcy Code's system of priority for creditor claims.  SIPA and the Code are consistent as to clawback actions, as they use the *identical* avoidance system.  Each regime—claim priority and avoidance and recovery—is governed by distinct statutory provisions that must be followed.

Customers address two additional issues, beginning with a value issue that the Trustee himself acknowledges has not been explicitly addressed by any court.[7]  As an alternative defense to avoidance, a customer is entitled to retain the value of property exchanged with the debtor measured as of the date of the transfer.  Cash delivered to the debtor in earlier years cannot be returned with a cash delivery valued as of the deposit date when inflation has eroded the value of the original deposit.  The debtor must provide cash valued *on the day of the transfer* to make the customer whole, i.e., adjusted at least for the loss to the customer resulting from the natural

---

[6]    *E.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378 (2d Cir. Mar. 3, 2011) Transcript of Oral Argument at 52:22–23 ("Mr. Sheehan: 'Fraud is a general creditor claim.'"); *id.* 61:4–7 ("Judge Jacobs: 'Standing alone it [the customer statement] would work fine at a fraud trial, it seems to me.'  Mr. Sheehan:  'At a fraud trial that's true.'"); Trustee's Sixth Interim Report at ¶ 115*, In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (Bankr. S.D.N.Y. Nov. 15, 2011) ECF No. 4529 ("All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate."); Trustee's Fifth Interim Report at ¶ 76, *In re Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (Bankr. S.D.N.Y. May 16, 2011) ECF No. 4072.

[7]    Trustee's Prop. Findings & Concls. at 27.

4

effects of inflation.  The Supreme Court and the Second Circuit have repeatedly endorsed this approach, reading into numerous statutes an inflation adjustment when (as here) the statute is otherwise silent and the adjustment is needed to reach a sensible result.

Second, the Trustee asks the Court to validate his computational method, which negates the value of late-year deposits by customers to their accounts.  The effect of the reach-back periods limiting the viability of avoidance claims, however, requires the Court to credit new deposits into an account made after the reach back-period begins.  Otherwise, the Court would improperly permit the Trustee to do indirectly what he cannot do directly: exploit time-barred transfers to the detriment of customers. The earlier *Antecedent Debt Decision* on this question no longer controls.

## ARGUMENT

**I.      The Section 548(c) Value Defense Is Available to SIPA Avoidance Defendants and Operates According to Its Plain Statutory Language.**

The avoidance claim before the Court in the *Cohen* action was brought under Section 548(a)(1)(A) of the Bankruptcy Code, which allows a bankruptcy trustee to avoid any fraudulent "transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition."  11 U.S.C. § 548(a)(1).  Where a trustee sues to avoid such a transfer, Section 548(c) provides an affirmative defense where the defendant took such transfer for "value and in good faith."[8]

The statute provides that a good faith transferee is entitled to retain all transfers to the extent that he gave value to the debtor, even if the transfer ultimately is shown to be fraudulent. *Id*. § 548(c).  "Value" is defined in the same statute as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . . "  *Id.* § 548(d)(2)(A).  A transferee may provide

---

[8]       The Trustee concedes the good faith of Mr. Cohen and all intervening customers.

5

value through the satisfaction of an antecedent debt or obligation owed by the debtor, such as an

existing legal or contractual obligation or liability on a claim. *Id.*

### A. Congress did not expand a SIPA trustee's avoidance powers beyond those set out in the Bankruptcy Code.

SIPA does not contain a separate avoidance remedy for trustees appointed in broker-

dealer liquidations; instead, it borrows the Bankruptcy Code's avoidance provisions. SIPA is

explicit on this point. SIPA Section 7 (entitled "Powers and Duties of a Trustee") vests in a

SIPA trustee "the *same powers* and title with respect to the debtor and the property of the debtor,

including the *same rights* to avoid preferences, as a trustee in a case under title 11." 15 U.S.C.

§ 78fff-1(a) (emphasis added). Likewise, SIPA Section 8 (entitled "Special Provisions of a

Liquidation Proceeding") employs similar limiting language. Specifically, SIPA Section 8(c)(3)

provides that the SIPA trustee may recover customer property transferred by the debtor "*if and to

the extent that such transfer is voidable or void under the provisions of title 11.*" 15 U.S.C. §

78fff–2(c)(3); *Picard v. HSBC Bank PLC*, 454 B.R. 25, 30 (Bankr. S.D.N.Y. 2011) ("the powers

of a SIPA trustee are still, as indicated, cabined by Title 11") (citing 15 U.S.C. § 78fff-2(c)(3));

*Greiff Ruling*, 476 B.R. at 722 n.7 ("SIPA expressly incorporates the limitations Title 11 places

on [a] trustee's powers . . .").

A SIPA trustee's avoidance powers are limited by Section 548(c) defenses. This is clear

from Bankruptcy Code provisions that, unlike Section 548(c), expressly defer to SIPA. *See* 11

U.S.C. §§ 555, 559 (excluding from any stay the liquidation rights of stockbrokers and repo

participants, unless "such order is authorized under the provisions of [SIPA]"); *id.* § 1501(c)(3)

(excluding from cross-broker bankruptcy jurisdiction "an entity subject to a proceeding under

[SIPA]"). In its unqualified use of the phrase "to the extent . . . voidable or void," SIPA adopts

the Bankruptcy Code's limitations on avoidance powers, which necessarily include the defenses in Section 548(c).  *See* 15 U.S.C. § 78fff–2(c)(3).

### B.    Section 548(c) does not conflict with SIPA.

Two prior district court decisions found that SIPA empowers a trustee to ignore the debtor's antecedent debts and obligations for purposes of the value defense if:  (1) the SIPA estate lacks sufficient funds to satisfy customer claims, and (2) the underlying antecedent debt would not have the same priority as "customer property" if asserted as a net equity claim for recovery against the SIPA customer estate.  *See Antecedent Debt Decision,* 499 B.R. at 423–25; *Greiff Ruling*, 476 B.R. at 727–28.  These rulings disregard clear statutory language in favor of concepts of equity and equalizing losses among brokerage customers, and they impermissibly conflate the SIPA claims process with a trustee's avoidance powers.  In the *Section 546(e) Decision* and in *Fairfield*,[9] the Second Circuit twice invalidated the reasoning on which the earlier rulings rely.  They are not controlling on any issue before this Court.[10]

---

[9]     *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) ("*Fairfield*").

[10]     Prior decisions of a court may always be revisited as long as the case is pending:  "[I]t is clear that all federal courts retain power to reconsider if they wish."  18B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478, at 667 (2002).  Further, this Court has the authority to reconsider the Section 548(c) defense because the district court's prior rulings merely denied motions to dismiss during temporary withdrawal of the reference.  *Greiff Ruling*, 476 B.R. at 717 n.1; *Antecedent Debt Decision*, 499 B.R. at 419 n.3.  *See* Fed. R. Civ. P. 54(b) (unless court directs entry of partial judgment, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment*") (emphasis added).  Additionally, the law of the case doctrine allows a court to revisit prior decisions when there has been an intervening change in controlling law or where the change is required to avoid manifest injustice.  *E.g.*, *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992); *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995).

### 1.  The Second Circuit has confirmed that Section 8(c)(3) is merely a standing provision, not an equitable expansion of avoidance powers.

SIPA Section 8(c)(3) grants a SIPA trustee standing to avoid transfers of customer property in which the debtor's estate would otherwise have no legal interest:

> Whenever customer property is not sufficient to pay in full [customer claims], the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11 of the United States Code. Such recovered property shall be treated as customer property.

15 U.S.C. § 78fff-2(c)(3); *see also Picard v. Merkin*, 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (Section 8(c)(3) "creates a fiction that grants the trustee standing to bring avoidance actions"). This section does not repeal Section 548(c) in any respect.

In *Fairfield*, the Second Circuit examined Section 8(c)(3) and confirmed that its purpose is to create a limited fictional debtor interest in customer property so that a SIPA trustee can pursue avoidance claims:

> [A] SIPA trustee stands in the shoes of a liquidating firm. But because money held by a broker on behalf of its customers is not the broker's property under state law, it would not be recoverable by a trustee in an ordinary bankruptcy. SIPA circumvents this problem through a statutorily created legal fiction that confers standing on a SIPA trustee by treating customer property as though it were "property of the debtor" in an ordinary liquidation.

762 F.3d at 212–13 (citations omitted); *see also Marshall v. Picard*, 740 F.3d 81, 90 n.11 (2d Cir. 2014) ("A recipient of a transfer is entitled to a 'good faith' defense upon a showing that it took the transfer 'for value' and 'in good faith.'").

Section 8(c)(3) expands the kinds of *property* that a SIPA trustee may seek to recover; it does not alter the requirements of avoidance or the statutory defenses to recovery. SIPA "merely engrafts special features onto the familiar framework of a liquidation proceeding under Chapter 7 of the Bankruptcy Code . . . to address the concerns peculiar to the orderly liquidation of a brokerage." *Fairfield*, 762 F.3d at 212 (citations omitted). The statute does not otherwise alter

the avoidance process; it does not recharacterize the property as "customer" property in the hands of the transferee or establish a presumption that a transfer is recoverable.  This is consistent with the tenet that fraudulently conveyed property is not "considered property of the estate until it is recovered."  *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992); *Fairfield*, 762 F.3d at 207, n.7 (transferred property is *not* property of the SIPA estate unless and until the transfer is properly avoided.).

Section 548(c) is not "inconsistent" with SIPA, as that word is used in SIPA Section 6(b). Section 6(b) provides that a SIPA liquidation "shall be conducted in accordance with, and as though it were being conducted under" provisions of the Bankruptcy Code, "to the extent consistent with the provisions of [SIPA]."  15 U.S.C. § 78fff(b).  Because SIPA *explicitly* incorporates the limitations on the Trustee's bankruptcy avoidance powers, the general caveat in Section 6(b) cannot be read to eliminate Section 548(c).  *See Lutz v. Chitwood (In re Donahue Secs., Inc.)*, 304 B.R. 797, 798 (Bankr. S.D. Ohio 2003) ("it is not inconsistent with SIPA to hold that a SIPA trustee is vested with the same rights as a bankruptcy trustee under §541(a) [of the Bankruptcy Code] where SIPA itself expressly dictates the same under §78fff-1(a)."); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *accord*, *Morales v. Trans World Airlines*, 504 U.S. 374, 384–85 (1992) (in statutory construction, "the specific governs the general").

Courts have a duty to reconcile provisions in related federal statutes, not to seek out a conflict between them.  *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2447 (2010) (statutes should be construed to be consistent with one another where the text permits).  Only in an extreme case where it is *impossible* to reconcile two federal statutes may a

court conclude that one is to be preferred over the other. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–42 (2001) (irreconcilable conflict between two statutes required for implied repeal); *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (implied repeal is only permissible where statutes are irreconcilable). Likewise, a court may not imply preemption from congressional silence. *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("[C]ongressional silence lacks persuasive significance" on preemption question); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) ("[M]atters left unaddressed in [a comprehensive and detailed federal] scheme are presumably left subject to the disposition provided by state law"); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616 (1997) ("[O]ur pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law"). If Congress wished to limit the availability of the Section 548(c) defense in a SIPA avoidance action, it could have done so. *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 453 (2007) ("where Congress has intended to provide exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly") (internal citation omitted).

Nor is it appropriate for a court to override statutory provisions based on its own notions of equity. *See Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); *Butner v. United States*, 440 U.S. 48, 55-56 (1979) ("undefined considerations of equity provide no basis" for federal courts to reject state law in the absence of "congressional command" or "identifiable federal interest"); *Travelers*, 549 U.S. at 452 (rejecting judicially-created

exclusion of state remedies, where "the court did not identify any provision of the Bankruptcy Code as providing support for the new rule").[11]

### 2. SIPA's priority claim distribution has no bearing on avoidance defenses.

Both SIPA and the Bankruptcy Code separate the distribution of estate property from the recovery of transfers. *Compare* 15 U.S.C. § 78fff-2(c)(1) *with* 11 U.S.C. § 726. A transfer avoided under Section 548 *and* recovered under Section 550 becomes the property of the estate available for distribution to creditors. *See* 11 U.S.C. §§ 541(a)(3), 550(a). Similarly, under SIPA, a transfer of customer property that is avoided and recovered becomes part of the fund of customer property for distribution pursuant to Section 8(c)(1). Like Bankruptcy Code Section 726, SIPA Section 8(c)(1) contains a priority scheme. Customer net equity claims have the highest priority, and if funds remain after those claims are satisfied and SIPC reimbursed, they are available for distribution for general unsecured claims. This structure is no different conceptually from the Bankruptcy Code, which provides for payment of administrative expenses and priority claims before payment of unsecured claims. The recovery and priority schemes of SIPA and the Bankruptcy Code are consistent.

Nevertheless, the district court concluded that antecedent debts cannot be treated as "value" for purposes of Section 548(c) unless the debts also would give rise to a priority claim against the SIPA customer estate. *Antecedent Debt Decision*, 499 B.R. at 422 n.6, 430 (debts that would not be priority customer claims "as against the Madoff Securities customer property estate under SIPA" could not be "value" under Section 548(c)). However, whether a customer

---

[11]     In *Butner* and *Travelers*, the Supreme Court relied on *statutory text* to determine whether Congress identified a sufficiently compelling federal interest to abrogate particular state law rights in the context of bankruptcy proceedings. *Butner*, 440 U.S. at 54 ("Congress has not chosen to exercise its power to fashion any such rule."); *Travelers*, 549 U.S. at 452 ("The absence of textual support is fatal for the [judicially created] rule.").

claim is entitled to priority under SIPA is irrelevant to the question of whether that customer gave value to the debtor at the time of the transfer under Section 548(c).

The Second Circuit, in the *Section 546(e) Decision*, reinforced the distinction between a trustee's avoidance claim and a SIPA trustee's determination of net equity customer claims. The Court confirmed that statutory defenses apply to the Trustee's avoidance actions *just as they do in any other bankruptcy avoidance proceedings*. In so holding, the Circuit made clear that its earlier *Net Equity Decision* does not control such issues:

> In our earlier decision, we interpreted "net equity" in a manner that would harmonize it with the SIPA statutory framework as a whole. Section 546(e), however, is part of the Bankruptcy Code, not SIPA, and was not in issue in *In re BLMIS*. This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality . . . We are obliged to respect the balance Congress struck among these complex competing considerations.

*Section 546(e) Decision*, 773 F.3d at 423 (citations omitted). This recognition of the statutory distinction between the computation of customer claims under SIPA and the avoidance provisions of the Bankruptcy Code applies equally to the Section 548(c) defense.

If Congress wished to inject a priority system for the operation of Section 548(c) in a SIPA proceeding, it clearly could have done so, just as it set out priorities in the distributive provisions of both the Bankruptcy Code and SIPA. Instead, the statute provides that an antecedent debt or obligation constitutes value without regard to the priority of the debt or obligation. In an ordinary bankruptcy case, there is no question that debts or obligations existing in favor of a transferee at the time of a transfer constitute value under Section 548(c) regardless of any priority they would have in a later bankruptcy proceeding.

The position that a legitimate debt must also be a customer priority claim in order to constitute value in a SIPA case requires a quantum leap beyond the plain language of the statutes. In the bankruptcy context, such an outcome would be equivalent to a determination that, where it

is likely that only administrative and priority creditors will receive distributions in a case, only the priority or administrative claims could constitute value under Section 548(c).    This improperly conflates recovery and priority in a way not contemplated by the Code.  It is also inconsistent with SIPA itself:  For example, Section 548(c) measures value at the time of the transfer, a point in time prior to any bankruptcy proceeding, whereas customer net equity claims are calculated as of the commencement of a SIPA liquidation.

The *Section 546(e) Decision* followed closely on the Second Circuit's decision in *Fairfield*, where the Court admonished against deviations from the Bankruptcy Code to effectuate perceived SIPA policy goals and confirmed that Section 8(c) was merely a standing provision.  The *Section 546(e) Decision* emphasized that "clawback defendants . . . have every right to avail themselves of all the protections afforded to the clients of stockbrokers, *including* the protection offered by § 546(e)."  773 F.3d at 420 (emphasis added).  The district court's rulings on Section 548(c) defenses, which purport to limit a customer's statutory defenses on grounds of equity or as a matter of statutory interpretation, are no longer good law in this Circuit.

## II.    Brokerage Customers Are Entitled to Retain All Transfers Made Under Their Brokerage Agreements Where the Trustee Fails to Avoid the Broker's Existing Obligations.

The issue in *Cohen* is whether the transfers by Madoff Securities satisfied obligations to Mr. Cohen that existed *at the time the payments were made*.  Section 28(a)(2) of the 1934 Act, of which SIPA is a part, expressly preserves all of a customer's rights and remedies arising under state law.   Indisputably, a brokerage customer has a state law right to recover from his stockbroker the full amount of the securities positions shown on his trade confirmations and brokerage account statements.  Likewise, the broker's remittance of the amount shown to be owed to the customer—upon the customer's request—is an enforceable legal obligation.

13

The Second Circuit unequivocally recognized these state law obligations in holding that an innocent customer's withdrawals from his Madoff Securities account satisfied the broker's contractual obligations to the customer:

> Each time a customer requested a withdrawal from BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the customer. *See* N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement). The statutory definition and *Enron* compel the conclusion that, for example, if I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client. As the district court correctly concluded, because the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, each transfer in respect of such an order or request constituted a settlement payment.

*Section 546(e) Decision,* 773 F.3d at 422–23. This holding is unambiguous: The Court's citation to Article 8 of the New York Uniform Commercial Code explicitly confirms that the securities entitlements arising in favor of a broker's customer are valid obligations under New York law.

Moreover, the 1934 Act confirms that Madoff's contractual obligations to customers are enforceable regardless of the broker's fraudulent conduct. As detailed below, the *in pari delicto* doctrine bars the Trustee from invoking common law to void those contractual obligations. Thus, the Trustee is left with a single statutory remedy: formal avoidance of the obligation under the Bankruptcy Code. Absent avoidance, the broker's valid contractual obligation to its customer constitutes an antecedent obligation or debt which, in turn, supports *all* ensuing transfers to the customer in response to his withdrawal requests. Here, New York law entitled Mr. Cohen to the full amount shown on his Madoff Securities statements. Any pre-petition withdrawals by Mr. Cohen satisfied that obligation and constituted "value" for purposes of Section 548(c).

### A.   Where a transfer was supported by the debtor's obligation to a transferee, a trustee must avoid the underlying obligation in order to recover the transfer.

Section 548(a)(1)(A) empowers a trustee under certain circumstances to avoid, if fraudulent, "any obligation incurred" by the debtor within the two-year look-back period immediately preceding the commencement of the liquidation proceeding.  Section 548(a)(1) allows the avoidance of an obligation even where "the incurrence of the obligation was intentionally fraudulent." *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 428 (Bankr. S.D.N.Y. 2011).  Courts construe the term "obligation" broadly:

> The Bankruptcy Code does not . . . define an "obligation," but it presumably means "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract." BLACK'S LAW DICTIONARY 1104 (8th ed. 2004). In most situations, therefore, the "obligation" will impose a "debt" on the obligor, and give a "claim" to the obligee.

*In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 203 (Bankr. S.D.N.Y. 2005); *In re James River Coal Co.*, 360 B.R. 139, 163 (Bankr. E.D. Va. 2007) ("'transfer or incur obligations' found in § 548 of the Bankruptcy Code is used in the 'most comprehensive' sense") (citations omitted).

The interplay between an antecedent obligation and an ensuing transfer was explained in *In re Lehman Bros. Holdings Inc.*, 469 BR 415 (Bankr. S.D.N.Y. 2012).  The incurrence of an obligation "is a preliminary aspect of a transactional process that must occur prior to or as a condition of transferring property or an interest in property." *Id.* at 444.  An obligation is "the legal prerequisite for a possible future transfer . . . " *Id.* at 445.  Where that legal predicate exists, the transfer relates back to the predicate obligation and was made in satisfaction of the original obligation, i.e., thus, an exchange for "value" between the parties.

Where a trustee does not avoid the debtor's underlying obligation (i.e., because the obligation was incurred prior to the look-back period),[12] the unavoided obligation supports a transferee's value defense to the later transfers.  The transferee "takes for value" because the transfer is an exchange made in satisfaction of the debtor's unavoided obligation.  For example, a trustee's attempt to avoid payments in satisfaction of a severance obligation incurred outside of the two-year look-back period cannot stand in light of Section 548(c), because "[t]he transfers of severance pay to the defendant satisfied the prior, unavoidable severance obligation, so the debtor received 'value' in exchange for the transfers."  *In re Incentium, LLC*, 473 B.R. 264, 272 (Bankr. E.D. Tenn. 2012).  Another court similarly explained:

> [W]here a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation.  Absent avoidance of the underlying contract, the payments discharge the obligation and are, by definition, for reasonably equivalent value.

*In re Central Ill. Energy Coop.*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) (citations omitted).

Similarly, in *In re All-Type Printing, Inc.*, 274 B.R. 316 (Bankr. D. Conn. 2002), the trustee could not avoid health care payments made four years before the debtor's bankruptcy filing because the trustee never avoided the underlying obligation, which was time-barred.  "Simply put, in order to have a chance of prevailing . . . the Trustee needed to seek to avoid the *incurring* of an *obligation*—the Retirement Debt—as well as the *transfer* of *property*—the Payments."  *Id*. at 324.  *Accord*, *In re HDD Rotary Sales, LLC*, 512 B.R. 877, 886 (Bankr. S.D. Tex. 2014) ("transfers are not avoidable because they were transfers made in satisfaction of

---

[12]    Notwithstanding this Court's recent ruling (531 B.R. 499), customers do not concede that the Trustee has authority to avoid obligations.  SIPA Section 8(c)(3) only addresses the recovery of *transfers* of customer property, and Section 7 addresses preferences.  *Compare* 11 U.S.C. §§ 548(a)(1), 544(b)(1) (providing for avoidance of transfers and "obligations incurred").  Without conceding, customers assume that the Trustee has such avoidance authority for purposes of this brief.

unavoidable obligations."); *In re Nirvana Rest.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (analyzing trustee's claim to avoid a guaranty and recapture rent payments thereunder; "'Fair consideration' includes the satisfaction of an 'antecedent debt.' A guaranty is an 'antecedent debt,' and the payment on account of an pre-existing guaranty is, therefore, supported by 'fair consideration.'"); *In re National Gas Distribs., LLC*, 412 B.R. 758, 766–67 (Bankr. E.D.N.C. 2009) ("the trustee may not avoid the transfers under §§ 548(a)(1)(A) and (B) made for the delivery of natural gas [from debtor to defendants]" if "the obligation to deliver that gas was incurred outside the . . . avoidance period").[13]

Customers are not aware of any case that allows a trustee to sidestep the avoidance of an obligation before recovering a transfer made pursuant to such obligation. To the extent that prior district court decisions intimate otherwise, i.e., that the Trustee can simply ignore Madoff Securities' legal obligations to its customers and recover related transfers without first avoiding the obligation, the *Section 546(e) Decision* invalidates such reasoning. In concluding that the transfers from Madoff Securities to its customers were settlement payments or transfers related to securities contracts, the Court confirmed for avoidance purposes the validity of the legal obligation owed to customers at the time of the transfers. *See Section 546(e) Decision*, 773 F.3d at 417, 421–22. The inescapable corollary of the Second Circuit's ruling that "the Account Documents obligate BLMIS to reimburse its customers upon a request for withdrawal" is that each time an innocent customer withdrew funds from a Madoff Securities account, that transfer satisfied a then-existing obligation: The transfer could not be a settlement payment without the

---

[13]    *See also In re TSIC, Inc.*, 428 B.R. 103, 115 (Bankr. D. Del. 2010) ("Debtor can avoid the underlying obligation thereby effectively eliminating the debt. Because no debt existed, Debtor's transfer of [defendant's] severance payment was for less than reasonably equivalent value."); *All-Type*, 274 B.R. at 324 (under state fraudulent conveyance law, if "the trustee also sought and obtained an avoidance of the incurring . . . obligation," then "the [p]ayments could no longer be supported by the value of debt satisfaction since no debt would exist.").

existence of a broker-customer relationship and the associated contractual and legal obligations. *See id.* at 419.

### B. The Trustee lacks standing to invoke common law to void Madoff's obligations to defendants—leaving the Trustee only with the remedy provided in the Bankruptcy Code.

Prior rulings rest on the premise that Madoff Securities' obligations to its customers, evidenced by the broker's customer statements and trading confirmations, are unenforceable because they were fraudulent. *See, e.g.*, *Antecedent Debt Decision*, 499 B.R. at 421, n.4. That reasoning, however, is flatly contrary to Section 29(b) of the 1934 Act, which confirms, first, that Madoff's obligations to its customers are enforceable regardless of the broker's fraudulent conduct, and, second, that the Trustee has no standing to avoid them under common law. Similarly, the doctrine of *in pari delicto* bars the Trustee from invoking common law to void those contractual obligations. To escape the effect of Madoff Securities' obligations and debts to its customers, the Trustee is left only with the avoidance remedy borrowed from the Bankruptcy Code. His failure to avail himself of that remedy is fatal to his claims.

#### 1. A fraudulent securities contract is voidable *solely* at the option of the *innocent party.*

Section 29 of the 1934 Act (entitled "Validity of Contracts") confirms that fraudulent securities contracts are fully enforceable unless voided by the innocent party:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) *as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .*

15 U.S.C. § 78cc(b) (emphasis added). The courts, including the Second Circuit, interpret Section 29(b) as establishing a rule of *voidability*, similar to the common law principle under

which an innocent party is afforded a remedy for fraud, but the fraud does not render the

fraudster's obligation unenforceable. *FDIC v. Giammettei*, 34 F.3d 51, 58 (2d Cir. 1994). *See*

*also Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Section 29(b) "was a

legislative direction to apply common-law principles of illegal bargain . . .") (Friendly, J.,

dissenting), *rev'd*, 527 F.2d 1141 (2d Cir. 1975).

Contracts made in violation of Section 29(b) are not *per se* void. Rather, they are

voidable at the option of the innocent party. As explained by one district court:

> [I]t is only the contract rights of the party in violation of the statute which are
> voided. The contract rights of the party not in violation are in no way
> impaired, and the innocent party may enforce the contract if he so desires.

*Pearlstein v. Scudder & German*, 295 F. Supp. 1197, 1204 (S.D.N.Y. 1968) (citations omitted),

*rev'd on other grounds*, 429 F.2d 1136, *cert. denied*, 401 US 1013 (1971). *See also Giammettei*,

34 F.3d at 58 ("The fraud alleged by the defendants constitutes fraud in the inducement . . .

render[ing] the notes voidable, not void."); *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 U.S.

Dist. LEXIS 81293, *18–20 (S.D.N.Y. Aug. 11, 2010) ("Contracts made in violation of section

29(b) are not void per se; rather, they are 'voidable at the option of the innocent party.' Only an

unwilling innocent may seek to rescind a contract under section 29(b).").[14]

Under Section 29(b), an innocent party may void a contract procured against him by

fraud, or may bring an action for money damages against the counterparty. *E.g.*, *Freeman v.*

---

[14]    This precept is black-letter law. *See, e.g., Mills v. Electric Auto-Lite Co.*, 396 U.S. 375,
387–88 (1970) (lower court interpretation of Section 29(b) that renders "the contract merely
voidable at the option of the innocent party . . . is eminently sensible . . . ."); *Cary Oil Co. v. MG
Ref'g. & Mktg., Inc.*, 230 F. Supp. 2d 439, 452–53 (S.D.N.Y. 2002) ("'contracts made in
violation of the securities laws, and thus subject to Section 29(b) of the Securities Exchange Act
of 1934 . . . are merely voidable at the option of the innocent party.'"); *Buffalo Forge Co. v.
Ogden Corp.*, 717 F.2d 757, 759 (2d Cir. 1983) (upholding dismissal under section 29(b) where
parties seeking rescission were not "unwilling innocent[s]"); *Drasner v. Thomson McKinnon Sec,
Inc.*, 433 F. Supp. 485, 502 (S.D.N.Y. 1977) ("Section 29(b) may only be invoked by an
'unwilling innocent party.'").

*Marine Midland Bank-New York*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976) ("[Section 29(b)]

make[s] [fraudulent] contracts voidable at the option of the innocent party. This interpretation

has permitted the investor, at his option, to void the contract as a defense to a lender's suit, to sue

on the contract for damages, to enforce the contract, or to seek rescission.") (citations omitted);

*Kardon v. National Gypsum Co.*, 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("Congress meant the

original statute to be interpreted as providing for civil suits under it . . . . [S]uch suits would

include not only actions for rescission but also for money damages."). *See also Cant v. AG

Becker & Co., Inc*., 384 F. Supp. 814, 816 (N.D. Ill. 1974) (in lieu of the rescission remedy under

Section 29(b), the plaintiff is entitled to an award of monetary damages, interest, and costs to

restore him to the position he would have been had it not been for the defendant's wrongful

activity, i.e., to be "placed in a posture which assumes that he had the opportunity to utilize his

funds in a reasonable manner.")

By contrast, the Trustee cannot invoke Section 29(b) to avoid a fraudulent contract. *See

JPMorgan*, 721 F.3d at 63 ("The debtor's misconduct is imputed to the trustee because, innocent

as he may be, he acts as the debtor's representative."). "[A] guilty party is precluded from

enforcing the contract against an unwilling innocent party.'" *RWP Consol., LP v. Salvatore*, 534

F. Supp. 2d 364, 368 (D. Conn. 2008) (quoting *Mills v. Electric Auto-Lite Co*., 396 U.S. at 387).

Because the Trustee lacks standing to invoke Section 29(b), the broker's contractual obligations

to its customers remain valid and enforceable under that statute unless a customer rescinds or

elects to void them. *See Buffalo Forge*, 717 F.2d at 759.

Mr. Cohen—whom the Trustee concedes to have been an innocent customer—has not

sought to void his customer agreement with Madoff Securities. It is therefore a fully enforceable

obligation under the federal securities laws and SIPA.

2.    **The doctrine of *in pari delicto* bars the Trustee from invoking common law principles to evade the broker's contractual obligations to customers.**

The common law principle of *in pari delicto* also bars the Trustee from invoking common law to avoid Madoff's contractual obligations.  *See JPMorgan*, 721 F.3d at 57–58 (dismissing all of Trustee's common law claims on basis of *in pari delicto*).  "The doctrine of *in pari delicto* is an equitable defense based on agency principles which bars a plaintiff from recovering where the plaintiff is itself at fault."  *Symbol Tech., Inc. v. Deloitte & Touche, LLP*, 888 N.Y.S.2d 538, 542 (N.Y. Sup. Ct. App. Div. 2d Dep't 2009).  *See also Axel Johnson, Inc. v. Arthur Andersen & Co.*, 830 F. Supp. 204, 208 (S.D.N.Y. 1993) ("The common-law defense of *in pari delicto* bars actions on the basis of the plaintiff's own culpability.").  In this proceeding, the Second Circuit already rejected the Trustee's arguments that he "himself is not a wrongdoer" and that "*in pari delicto* should not impede the enforcement of securities laws":

> [The Trustee] argues that in a typical bankruptcy *in pari delicto* is designed to bar corporate malefactors, including shareholders, from recovering, whereas in a SIPA liquidation the trustee marshals assets for the benefit of the customer property estate. Accordingly, there is no similar concern here that funds collected by the trustee would be distributed to wrongdoers. But, in *Kirschner v. KPMG LLP*, the New York Court of Appeals declined to make an exception to the *in pari delicto* doctrine despite the trustee's urging that proceeds would "benefit blameless unsecured creditors . . . and shareholders."

*JPMorgan*, 721 F. 3d at 63 n.12.

As the New York Court of Appeals explained in *Kirschner*, "the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'" *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (cited in *JPMorgan*, *supra*).  Because Madoff Securities' fraud is imputed to the Trustee, the doctrine of *in pari delicto* bars him from asserting common law claims for relief on behalf of the estate.  *See HSBC*, 454 B.R. at 37

("[T]he Trustee cannot bring his common law claims on behalf of the estate. This is because such claims are negatived by the common law doctrine of *in pari delicto*, which 'bars a trustee from suing to recover for a wrong that the debtor whose the estate he represents essentially took part in.'") (citation omitted); *see also JPMorgan*, 721 F. 3d at 58, 63; *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 531 B.R. 439, 449 (Bankr. S.D.N.Y. 2015) ("Because the trustee stands in the shoes of the debtor, he cannot assert claims that the debtor could not assert under non-bankruptcy law.").

Moreover, "in federal court prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by *in pari delicto*." *HSBC*, 454 B.R. at 29 (*citing Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)). Accordingly, any suggestion that the Trustee here can simply sidestep Madoff Securities' contractual obligations to customers is contrary to federal and common law.

### C.   Mr. Cohen has a complete defense to avoidance because the Trustee failed to avoid the debtor's obligations, and each transfer satisfied such unavoided obligations.

In Mr. Cohen's case, the Trustee failed to plead a claim under Section 548(a)(1) to avoid Madoff Securities' contractual or legal obligations. Because the obligations underlie all of the transfers at issue and, as explained above, constitute value supporting the customer's retention of the transfers, Section 548(c) provides Mr. Cohen a complete defense. *See, e.g., In re Central Illinois*, 526 BR at 790-91 (rejecting trustee's "unpleaded theory that [an agreement] was avoidable as a fraudulently incurred obligation because [the trustee] had not filed a complaint to do so within the time required by law"—and noting that the "limitations period for such [avoidance] actions had expired several years ago.").

Accordingly, the Trustee's claims should be dismissed, and the Court should enter judgment in favor of Mr. Cohen.

III.   **Customers Also Have Federal and State Law Rights to Retain Amounts in Satisfaction of Their Tort Claims for Damages, Interest, and Consequential Damages.**

This Court has recognized, and the Trustee has conceded, that the principal in a customer's account is value under Section 548(c).  Indeed, it is indisputable that every innocent Madoff Securities customer had a right to the return of principal based on the Trustee's admissions of widespread fraud at the broker dealer.[15]  But value under Section 548(c) is not limited only to the customer's principal deposits.  In addition to the contractual obligation owed to Mr. Cohen for the value shown on his Madoff Securities statements, he also held rights to payment grounded in tort under non-bankruptcy state and federal law at the time of each withdrawal.  These rights are "claims" that fall squarely within the definition of value under Section 548(c).  *See, e.g.*, *In re Bennett Funding Group, Inc*., 1999 Bankr. LEXIS 1843 at *25–26 (Bankr. N.D.N.Y. Apr. 29, 1999) (alleged Ponzi operators "would have faced contingent liability to Defendant (on theories ranging from fraud to restitution) from the moment they were entrusted with his money," accordingly, transfers that "incidentally served to satisfy Defendant's unasserted, undiscovered, and possibly unimagined tort rights—operated as the satisfaction of an antecedent debt, and hence as an exchange for value under Code § 548(c).") (citations omitted).

A.   **Mr. Cohen held federal securities fraud claims against Madoff Securities at the time of the transfers, which are valued by their available remedies.**

Every innocent Madoff Securities customer undeniably held a federal securities claim against the broker from the inception of the relationship, as the relationship itself was procured by fraud.  The Trustee admits that Madoff Securities received customer payments intended for the purchase and sale of securities but did not purchase any securities, instead sending brokerage

---

[15]   Nothing herein concedes that the Trustee has proved the scope of Madoff Securities' fraud.

statements to its customers that contained lies.  These admissions establish that each customer

held a Rule 10b-5 claim against the broker from the time of his first deposit of funds.[16]  The

remedies for securities fraud[17] (and, therefore, the value of such a claim) include rescission of the

transaction, recovery of principal, *and* compensation for the loss of the time value of money,

expressed as an award of interest.[18]

In addition, the Securities Act of 1933 ("1933 Act") provides for rescission and interest

in the case of misrepresentation in connection with the sale of securities.  15 U.S.C. § 77*l*(a)(2).

Section 12(a)(2) provides that the victim may recover the "consideration paid for such security

with interest thereon, less the amount of any income received thereon . . . ."[19]  15 U.S.C.

§ 77l(a)(2).  In *Randall v. Loftsgaarden*, the Supreme Court held that Rule 10b-5 cases should be

construed consistently with the express remedy in the 1933 Act.  478 U.S. 647, 662–63 (1986).

---

[16]     "[A] broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (same); *see also Grippo v. Perazzo*, 357 F.3d 1218, 1220–24 (11th Cir. 2004).

[17]     The defrauded customer has a claim whether or not the broker actually purchases securities, in part because the customer has no means to confirm a transaction other than the brokerage account statement.  *Schnorr v. Schubert*, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) ("[U]nfulfilled promises to purchase securities qualify as *actual* purchases").

[18]     *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 87 (2d Cir. 1980) ("In view of the high inflation rates that beset this period [during which the defendant exercised control over the defrauded plaintiff's investment], a damage award without prejudgment interest (or, indeed, even one that does include it) would not give [Plaintiff] full compensation for the losses he suffered at the hands of his fiduciary.").

[19]     In adopting Section 12(a)(2), Congress borrowed from the existing common law, which recognized the right to interest in addition to return of principal as part of the rescission remedy.  *See Schott v. Maidsville Coal Min. P'ship*, 1979 WL 1245, at *4 (S.D.N.Y. Sept. 7, 1979) (plaintiff is entitled to the purchase price of the securities, less any distributions made, plus interest on § 12(a)(2) claim); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(4) (2010) ("Liability in restitution . . . normally includes prejudgment interest (a) from the date of payment to a conscious wrongdoer [or] a defaulting fiduciary . . ."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 354(1) (1981) ("If the breach consists of a failure . . . to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due . . .").

Thus, the 1933 Act establishes rescission with interest as a remedy in Rule 10b-5 claims.[20]  As

discussed *supra*, Section 29(b) of the 1934 Act also entitles customers to choose to void their

brokerage contracts in favor of ancillary remedies.[21]  15 U.S.C. § 78cc(b).  Where Section 29(b)

is invoked, the available remedy is rescission,[22] including return of the consideration paid and

"interest thereon."

　　　　Remedies for securities fraud also include consequential damages, such as out-of-pocket

costs and lost opportunity damages.  *See, e.g.*, *Rolf*, 637 F.2d at 86–87; *Zeller v. Bogue Elec. Mfg.*

*Corp.*, 476 F.2d 795, 803 (2d Cir. 1973) (consequential damages are available for federal

securities law claims when established with certainty).  *Cf. Stevens v. Abbot, Proctor & Paine*,

288 F. Supp. 836, 850–51 (E.D. Va. 1968) (finding that percentage of capital gains taxes due to

---

[20]　　　*See, e.g., Bass v. Janney Montgomery Scott, Inc.*, 152 F. Appx. 456, 458 (6th Cir. 2005)
(rescission in Rule 10b-5 case includes return of consideration paid with interest thereon);
*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999) (true
rescission in a Rule 10b-5 case involves the return of consideration furnished plus interest); *see
also Brick v. Dominion Mortg. & Realty Trust*, 442 F. Supp. 283, 303–04 (W.D.N.Y. 1977)
(New Jersey blue sky statute providing for recovery of consideration paid for a security plus 6%
interest effectively provides same recovery as Rule 10b-5); *Westinghouse Elec. Corp. v. '21'
Intern. Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993) ("the legal standards to be applied
in determining whether an injured party is entitled to rescission for violation of Rule 10b-5 and
§§ 12(a)(2) and 17 are essentially the same as the standards developed in the common law fraud
cases.") (citations omitted).

[21]　　　*See, e.g., American Gen. Ins. Co. v. Equitable Gen. Co.*, 493 F. Supp. 721, 767–68 (E.D.
Va. 1980) (plaintiffs were entitled to rescission and prejudgment interest from the date of the
initial fraudulent transfer under 29(b)); *Cant v. A.G. Becker & Co., Inc.*, 384 F. Supp. 814, 816
(N.D. Ill. 1974) ("A failure to assess interest . . . would have the affect [sic] of allowing parties to
speculate with the funds of innocent persons, without fully compensating such victims for the
unlawful use of their assets."); *Scheve v. Clark*, 596 F. Supp. 592, 596 (E.D. Mo. 1984) (proper
remedy for securities fraud includes pre-judgment interest at a rate "which will adequately
compensate the plaintiffs for the loss of the use of their money.").

[22]　　　The same principles that govern the express rescission remedy in Section 12(a)(2) of the
1933 Act govern the parallel rescission remedy set forth in Section 29(b) of the 1934 Act.  *See
Randall*, 478 U.S. at 662–63 and discussion *supra*.

defendant's fraudulent conduct were recoverable as actual damages).    Every innocent Madoff

Securities customer has the right to raise and prove these claims as a defense to avoidance.

> **B.    Mr. Cohen's state fraud and breach of fiduciary duty claims against Madoff Securities are also value for purposes of Section 548(c).**

New York courts have long recognized that fraud victims are entitled to recover

consequential damages attributable to fraud.    *Big Apple Car, Inc. v. City of New York*, 611

N.Y.S.2d 533, 534 (N.Y. App. Div.  1994).    Likewise, breach of fiduciary duty claims carry lost

opportunity damages.    *See 105 E. Second St. Assocs. v. Bobrow*, 573 N.Y.S.2d 503 (N.Y. App.

Div. 1991) (damages for breach of fiduciary duties include "lost opportunities for profit . . . by

reason of the faithless fiduciary's conduct").[23]    In an analogous scenario, the Second Circuit

applied the Restatement (Second) of Trusts to conclude that "[o]ne appropriate remedy in cases

of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would

have occupied but for the breach of trust."    *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.

1985) (breach of fiduciary duties under ERISA).    All of these claims for damages constitute

value under Section 548(c).

Madoff Securities' customers undisputedly held claims for breach of fiduciary duty from

the inception of their relationship with the broker.[24]    These claims entitle customers to interest in

---

[23]    *See also* RESTATEMENT (SECOND) OF TORTS § 874 cmt. b (1979) (stating that remedies for breach of fiduciary duty may include "tort damages for harm caused by the breach," "restitutionary recovery," and "profits that result to the fiduciary from his breach of duty").

[24]    The New York Court of Appeals recognizes common law claims for breach of fiduciary duty in the securities context.    *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 351 (N.Y. 2011).    In New York, a broker's failure to invest in securities, thereby "abusing the position as broker-agent to gain profits at the client's expense," gives rise to a damages claim against the faithless fiduciary.    *Lowenbraun v. L.F. Rothschild*, 685 F. Supp. 336, 343 (S.D.N.Y. 1988).

addition to principal.[25]  In New York, compensation from the tortfeasor for loss of the time value

of money is mandatory.  *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 265–66

(2011).[26]  Indeed, New York law *compels* the award of interest under the circumstances here:  "It

has been the settled rule that interest must be allowed as a matter of right on recoveries for

intentional tort with respect to property and property rights."  *DeLong Corp. v. Morrison-*

*Knudsen Co., Inc.*, 244 N.Y.S.2d 859, 862 (N.Y. App. Div. 1963) (citing *Flamm v. Noble*, 296

N.Y. 262 (N.Y. 1947), *aff'd*, 14 N.Y.2d 346 (N.Y. 1964)), *aff'd*, 200 N.E.2d 557 (N.Y. 1964);

*see also Purcell v. Long Island Daily Press Publ'g Co.*, 9 N.Y.2d 255, 257–58 (N.Y. 1961).

New York has codified this rule of mandatory interest on tort awards.  *See* N.Y. C.P.L.R.

§ 5001(a) ("Interest *shall* be recovered upon a sum awarded . . . because of an act or omission

depriving or otherwise interfering with title to, or possession or enjoyment of, property")

(emphasis added); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 694 (2d Cir. 1983) (statute did not

constrict common law rule).  It is "New York's prevailing policy, interwoven into § 5001, that

'interest must be added [in actions where persons are deprived of the use of money] if we are to

make the plaintiff whole.'"  *Mallis*, 717 F.2d at 695 (quoting *Prager v. New Jersey Fid. & Plate*

---

[25]     New York law recognizes that a breach of fiduciary duty entitles a claimant to pre-
judgment interest.  *Wolf v. Rand*, 685 N.Y.S.2d 708, 710 (N.Y. Sup. Ct. App Div 1999).  Courts
award prejudgment interest on equitable claims such as rescission because the plaintiff should be
"compensated for being deprived of the use of its money."  *USPS v. Phelps Dodge Refining
Corp.*, 950 F. Supp. 504, 518 (E.D.N.Y. 1997).  Similarly, courts frequently provide interest
payments in breach of fiduciary duty cases.  *E.g.*, *In re Estate of Newhoff*, 435 N.Y.S.2d 632, 637
(N.Y. Surr. Ct. Nassau Cty. 1980) (measure of damages is "the amount of funds invested *plus the
legal rate of interest* from the date of investments with appropriate credits for the moneys
received on account of such investments.") (emphasis added).

[26]     The *NML Capital* court recognized a distinct injury for the loss of use of funds, separate
and apart from the obligation to return principal:  "plaintiffs are entitled to be compensated for
the loss of the time value of that money—which can be accomplished only by awarding them
statutory interest on the unpaid interest-only payments."  17 N.Y.3d at 266.

*Glass Ins. Co.*, 245 N.Y. 1, 6 (N.Y. 1927)) (alteration in original).  New York's statutory interest rate is 9%.  N.Y. C.P.L.R. § 5004.[27]

SIPA preserves these state and federal rights and remedies through Section 28(a)(2) of the 1934 Act.  They are part of the fabric of a good faith transferee's statutory defenses to an avoidance action.  Each customer is entitled to the benefit of his bargain for the broker's tortious conduct; the fraud underpinning each element of the customer's claim occurred every time the broker accepted a deposit without the intention of trading in securities or issued a fraudulent account statement.  Customers such as Mr. Cohen may elect to establish the claim that provides the most value at the time of each withdrawal, subject to individualized proof.

**IV.    At a Minimum, Customers Are Entitled to Retain the Real Value of the Property They Deposited with Madoff Securities Measured at the Time of the Transfer, Which Is Greater than the Face Amount of Earlier Deposits.**

"Value" under Section 548(c) includes "property" in addition to the "satisfaction . . . of a present or antecedent debt . . . ."  11 U.S.C. § 548(d)(2).  Here, the Trustee concedes that deposited principal is "property" and thus value for Section 548(c), but seeks to avoid transfers exceeding the amount of each customer's principal deposits.  However, Section 548(c) allows a defendant to retain property exchanged, valued as of the date of the transfer.  As a basic principle of economics, money deposited years ago has less value today because of the passage of time.  Mr. Cohen made deposits to his Madoff Securities account long before the firm's collapse.  For purposes of avoidance liability—in addition to his other remedies—the law entitles him to retain the real economic value of his property, i.e., his deposits, as of the time of the later transfers.

---

[27]     New York courts have long recognized that fraud victims are entitled to either (i) disaffirm the contract by a prompt rescission; or (ii) stand on the contract and maintain an action at law for damages attributable to the fraud.  *Big Apple Car, Inc. v. City of NY*, 611 N.Y.S.2d 533, 534 (N.Y. App. Div. 1st Dep't 1994).

None of the prior litigation over inflation adjustments for SIPA claims addressed this issue in the context of avoidance claims, contrary to the Trustee's position. The *Net Equity Decision* and the *Constant Dollar Decision* hold only that the Trustee's discretion to calculate net equity claims is circumscribed by SIPA. Nowhere, however, did the Court of Appeals credit the idea that old dollars are equivalent to dollars valued at current prices. The difference between SIPA's net equity calculations and the Bankruptcy Code's treatment of value defenses is grounded in the fundamental differences between the statutes: Bankruptcy Code Section 548(c) frames value determined as of a fixed time and in real economic terms, rather than by application of a formula designed to give priority to a special category of creditors.

### A. Value under Section 548(c) is what customers lost—here, far more valuable dollars than the face value of the transfer.

In measuring a transfer's "value" under Section 548(c), the focus is what the transferee gave up.[28] It is black-letter law that the value of an allegedly fraudulent transfer is measured as

---

[28]    This transferee focus is clear from the text of Section 548(c) itself. *See* 11 U.S.C. § 548(c) (the defense applies "to the extent that such transferee . . . *gave* value to the debtor in exchange for such transfer or obligation."). *See e.g., In re Hannover*, 310 F.3d 796, 802 (5th Cir. 2002) ("[Section 548(c)] looks at value from the perspective of the transferee: How much did the transferee 'give'? The concern here, quite properly, is the transferee's side of the exchange, not the transferor's gain."); *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 680 (S.D.N.Y. 2000) ("whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise"); *Chen v. New Trend Apparel, Inc*., 8 F. Supp. 3d 406, 449 (S.D.N.Y. 2014) (focus of "value" inquiry is "the quid pro quo exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business.") (quoting *Churchill*). *See also In re Universal Clearing House Co.,* 60 B.R. 985, 1000 (D. Utah 1986) ("a determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise"); *In re Financial Federated Title & Trust,* 309 F.3d 1325 (11th Cir. 2002) (following *Universal* and remanding to allow defendant to show value of services provided as broker to Ponzi scheme); *In re World Vision Entm't., Inc.,* 275 B.R. 641 (Bankr. M.D. Fla. 2002); *In re First Commercial Mgmt. Group, Inc.,* 279 B.R. 230 (Bankr. N.D. Ill. 2002); 5 COLLIER ON BANKRUPTCY ¶ 548.03[5] (transferee's providing of value "is valued as of the date of the transfer").

of the date of that transfer.[29]  The issue in this proceeding is how to calculate the value to be set

off against the transfer when Mr. Cohen deposited funds years, even decades, before the transfer

sought to be avoided.  The answer requires construing two statutory directives *in pari materia*: (1)

that value is seen from the perspective of the transferee (i.e., what value did the transferee give

up?), and (2) that the voidable transfer is valued as of the later date of the transfer.  From the

vantage point of the later transfer (as Section 548(c) requires), only an inflation adjustment of the

deposited cash permits a meaningful comparison to, and credit against, the transfer.  This is

consistent with the statute and comports with economic reality.[30]

The Trustee's contrary position hinges on the fiction that dollars from different eras may

be equated on a nominal, unadjusted basis.  This overly simplistic approach—that a dollar is a

dollar—conflicts with the most basic economic principles:  Assume customer Jones entrusted $1

million to Madoff Securities in 1988, and withdrew $1.1 million in 2008.  The Trustee sues

---

[29]     *Id.  See also, In re Morris Communications NC, Inc.*, 914 F.2d 458 (4th Cir. 1990) (sale of licenses upheld against avoidance even though licenses subsequently appreciated in value); *In re Chomakos*, 69 F.3d 769, 771 (6th Cir. 1995) ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the . . . question whether reasonabl[y] equivalent value was given."); *Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 336–37 (S.D. Tex. 2008) ("courts should measure the value of the property transferred and the consideration received at the time of the transfer").  *Accord, In re Whitney*, 2007 Bankr. LEXIS 2628 (Bankr. D. Md. July 30, 2007); *Official Comm. v. Conciera Sabrina*, 195 B.R. 602 (Bankr. M.D. Pa. 1996).

[30]     Analogously, Section 550(e) grants a good faith transferee a lien on the property transferred to the extent of any improvements, recognizing that the value of property fluctuates and that a transferee may incur custodial costs, all of which should be valued in avoidance.  *See* 11 U.S.C. § 550(e)(2) (examples of various improvements that are protected, including steps made to "preserv[e]" such property).  For example, no one would contend that a trustee could satisfy a creditor's claim for a fresh apple entrusted to the debtor a year ago by returning last year's apple (undoubtedly having rotted in the interim).  Rather, the trustee would have to return a fresh apple of like kind and quality, either buying it in the market or tendering its real cash equivalent.  Just as the Trustee must credit an innocent transferee with the true value of the property entrusted, so, too, must the innocent transferee be credited for the amounts by which the cash exchanged with the transferor deteriorated in value over time.  Without that adjustment, the customer does not receive the true economic value of his original account deposits.

Jones for recovery of $100,000, the nominal amount transferred greater than the original deposit. Valued under the standard Bureau of Labor Statistics inflation measure, however, the $1 million in 1988 dollars is actually worth $1,819,974 in 2008 dollars—much more than the total of the transfer sought to be avoided.[31] Viewed as of 2008 (as Section 548 requires), the value Jones gave up in 1988 far exceeded the amount he received in 2008. Jones should have no liability in the Trustee's $100,000 clawback action.

**B.    Both the Supreme Court and the Second Circuit have repeatedly required inflation adjustments when a statute is silent on the issue.**

While Section 548(c) does not *expressly* direct the Court to take inflation into account in avoidance claims, both "value" and "property" are statutory terms requiring interpretation for their computation. In similar situations, the Supreme Court and the Second Circuit regularly account for inflation when the governing statute says nothing about such an adjustment.

For example, in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 540–41 (1983), the Supreme Court required an inflation adjustment for lost wages—despite statutory silence— because "there is now a consensus among courts that the prior inequity [of not so adjusting] can no longer be tolerated." In *Randall v. Sorrell*, 548 U.S. 230, 261 (2006), the Court invalidated a state law limit on campaign contributions, reasoning that the statute's "contribution limits are not adjusted for inflation." "A failure to index limits means that limits which are already suspiciously low . . . will almost inevitably become too low over time." *Id. See also Amchem Prods. v. Windsor*, 521 U.S. 591, 627 (1997) (denying a class action tort payment arrangement because, *inter alia*, "the settlement includes no adjustment for inflation."); *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) ("A debtor's promise of future payments is worth less than an

---

[31]    *See* http://data.bls.gov/cgi-bin/cpicalc.pl?cost1=1100000&year1=1988&year2=2008.

immediate payment of the same total amount because," among other things, "inflation may cause the value of the dollar to decline before the debtor pays …").

Similarly, the Second Circuit recognizes the real world effects of inflation and, when appropriate, orders inflation adjustment despite statutory silence. *E.g.*, *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 36 (2d Cir. 1980) ("inflation should be considered in estimating the present value of lost future wages."); *Trichilo v. Secretary of Health & Human Services*, 823 F.2d 702, 706 (2d Cir. 1987) (statutory adjustment provision construed to include high-inflation years: "Nor are we told why the 1985 Congress, obviously concerned enough about inflation to reenact the cost-of-living escalator, would want to ignore the inflation that had occurred between 1981 and 1985.").

As Judge Hand aptly observed, "in modern financial communities a dollar to-day is worth more than a dollar next year, and to ignore the interval as immaterial is to contradict well-settled beliefs about value." *Procter & Gamble Distrib. Co. v. Sherman*, 2 F.2d 165, 166 (S.D.N.Y. 1924). This concept, repeatedly judicially recognized,[32] is integral to the appropriate valuation of property exchanged and thus to the value to be retained by the transferee.

## V.     Ponzi Scheme Cases That Do Not Involve Brokerage Customers Are Irrelevant.

The term "Ponzi scheme" does not appear in SIPA or the Bankruptcy Code, nor does Section 548(c) have any exception for what the Trustee characterizes as "fictitious profits". Nevertheless, the district court's prior rulings concluded that transfers in excess of a customer's principal were not made for value because they were intended by Madoff Securities to further the

---

[32]     This concept has long been recognized as a reality in legal and financial matters. *E.g.*, *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746 (2d Cir. 1988) ("[A] dollar received in the future will almost surely have less purchasing power than a dollar has today"); *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) ("[P]ayment ten years hence is not generally the equivalent of payment now") (Hand, J.). *See also United States v. Will*, 449 U.S. 200, 220 (1980) (acknowledging the "ravages of inflation").

Ponzi scheme.  *See Antecedent Debt Decision,* 499 B.R. at 430; *Greiff Ruling*, 476 B.R. at 725.

But the Second Circuit has since rejected just this kind of  argument:  "The Trustee argues that,

to allow customers to retain the fictitious profits Madoff arbitrarily bestowed on them amounts to

giving legal effect to his fraud.  This argument, albeit compelling, is ultimately not convincing."

*Section 546(e) Decision*, 773 F.3d at 423.  Specifically, the Second Circuit explained that the

relevant policy choice is one for Congress, and the courts "are obliged to respect the balance

Congress struck among these complex competing considerations."  *Id.*

    In its prior rulings, the district court and this Court relied on a line of cases that limit

equity investors in a Ponzi scheme to recovery of their principal.  *Greiff Ruling*, 476 B.R. at 725

(stating that "every circuit court to address this issue has concluded that an investor's profits

from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value.'").  Whatever

the merits of the Ponzi scheme cases,[33] they do not apply.   Mr. Cohen and similar innocent

customers were not equity investors in the business of Madoff Securities, but instead deposited

money with a registered broker for the purpose of purchasing and selling securities.  This status

is fundamentally different from one of equity investors, in part because customers *did* have

contractual rights to payment of the funds purportedly held by the broker.  The *Section 546(e)*

*Decision* reinforces this conclusion, by holding that the transfers were (a) settlement payments in

light of customers' UCC rights to recover securities entitlements, and (b) payments in connection

with a securities contract, regardless of Madoff Securities' fraud.  773 F.3d at 421–22.  It is one

---

[33]    *See In re Hedged-Invs. Assocs., Inc.*, 48 F.3d 470, 475 (10th Cir. 1995) (finding it "[s]triking" [in preference context] that "none of those cases cite any language or legislative history in support of" a Ponzi-scheme exception, and that "[r]ather, it appears to us that this bright line rule has developed solely from precedent that does not support it."); *accord, In re Bennett Funding Grp., Inc.*, 253 B.R. 316, 322 (Bankr. N.D.N.Y. 2000) (same); *see also Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) ("The word 'Ponzi' does not appear in the Minnesota Statutes, and [the Minnesota enactment of the Uniform Fraudulent Transfer Act] does not address 'schemes.'").

thing to limit the claims of investors who place their funds at risk as capital in a fraudulent business; it is another thing entirely to say that brokerage customers who deposit their funds in a regulated entity are limited to return of principal.

Cases such as *Donell, Scholes*, and *Hedged-Investments* do not involve customers of a registered broker-dealer. To the contrary, every defendant in those cases intended to place his capital at risk in a business enterprise, whether in a debt scheme or a hedge fund. *Donell* had nothing to do with a broker relationship, but rather involved an investor who financed a receivable factoring operation. *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008). Both *Hedged-Investments* and *Scholes* involved sales of limited partnerships in an investment vehicle that was operated as a Ponzi scheme. *In re Hedged Invs. Assocs., Inc.*, 84 F.3d 1286 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

The Fifth Circuit's decision in *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014) is readily distinguishable. The *Janvey* court's determination that a receiver could assert claims on behalf of the corporations in receivership, without a *in pari delicto* bar, turned in part on the innocence of some of the insolvent entities.[34] Likewise, while the Fifth Circuit interpreted Texas public policy to restrict the holders of foreign bank CDs from retaining contractual interest payments, here the relevant federal public policy was fixed by Congress in Section 29(b) of the 1934 Act,

---

[34]     The insurance cases cited by this Court are distinguishable on the same grounds. *See* 531 B.R. at 475-79 (*citing Jacobson Family Invs., Inc. v. Nat'l Union Fire Ins. Co.*, 955 N.Y.S.2d 338, 346 (N.Y. Sup. Ct. App. Div. 1st Dep't 2009); *Horowitz v. Am. Int'l. Group, Inc.*, No. 09-Civ-7312, 2010 US Dist. LEXIS 103489, *23–27 (S.D.N.Y. Sept. 30, 2010)). Wrongdoing is not imputed to an insurance carrier, so *in pari delicto* does not apply in that context. *See, e.g., McRaith v. BDO Seidman, LLP*, 909 NE 2d 310, 336 (Ill. App. Ct. 2009)("[I]t would be unlawful, as well as illogical, to impute [the individual's] guilty knowledge or disloyal, predatory conduct to . . . the insurance companies . . .") (citations omitted); *Reider v. Arthur Andersen, LLP*, 784 A.2d 464, 475 (Conn. Super. Ct. 2001)("The [individual's] fraud is not imputable to [the insurance company] because their interests were always adverse to the public's enforceable interest in ensuring the insurer's continuing solvency.").

which allows innocent customers to invoke their contractual rights. *See supra* at 18-21. To the extent that this Court viewed the *Janvey* decision as persuasive, that reliance is unsupportable.

The closest analogous precedent is the Sixth Circuit decision in *Visconsi v. Lehman Bros.*, 244 F. Appx. 708 (6th Cir. 2007). There, a Lehman broker perpetrated a Ponzi scheme by soliciting customer deposits of more than $21 million and sending fictitious account statements to the customers, who ultimately withdrew $25.8 million over several years. *Id.* at 710. The broker eventually admitted that he had operated a Ponzi scheme and that the customers' actual account balances were negative, rather than the amounts listed on their account statements. *Id.* at 709–10. The Sixth Circuit upheld an arbitration award against Lehman for $10 million in excess of the amount withdrawn, flatly rejecting the broker's argument that plaintiffs could not recover the amounts shown on their statements:

> [T]he out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. Had [the broker] invested Plaintiffs' money as requested, their funds would have likely grown immensely. . . . Plaintiffs thus . . . were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id.* at 713–14; *see also Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74, 76–77 (D. Mass. 1984) (denying motion to dismiss customer breach of contract claims against broker-dealer seeking benefit-of-the-bargain damages); *In re Churchill Mortg. Inv. Corp.*, 256 B.R. at 680 (Bankr. S.D.N.Y. 2000) (holding that "Trustee's fraudulent conveyance claims to recover commissions from [defendant] Brokers must be dismissed as a matter of law" pursuant to Section 548(c) because the Brokers "produced and thereby gave value, giving rise to a contractual obligation on the part of [the Debtor] to pay the commissions here at issue.").

In the absence of bad faith by the transferee, the source of Madoff Securities' funds is irrelevant to a Section 548(c) defense. Under time-honored principles, a payment that discharges

a valid debt does not harm the payor's creditors, making the origin of funds irrelevant. *CFTC v. Walsh*, 17 N.Y.3d 162, 173 (2011) ("to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear"); *In re Sharp Int'l Corp.*, 403 F.3d 43, 54–55 (2d Cir. 2005); *Boston Trading Grp., Inc. v. Burnazos,* 835 F.2d 1504, 1508 (1st Cir. 1987) (fraudulent conveyance law has purpose different from equitable doctrines of restitution). *See also Daly v. Parete (In re Carrozzella & Richardson)*, 270 B.R. 92, 97 (Bankr. D. Conn. 2001) (a transaction's illegality does not deprive the exchange of value).[35]

## VI.  Where Customers Made Deposits to Their Accounts During the Two-Year Reach-Back Period, the Court Must Credit the New Value Added to the Estate.

The Trustee also asks the Court to disregard a customer's entitlement to credit for new deposits made during the two-year reach-back period. Trustees' Prop. Findings & Concls. at 26. The *Section 546(e) Decision* bars the Trustee from pursuing transfers made before the two-year reach-back period. Yet the Trustee's approach would improperly extend indefinitely the reach-back period by netting stale transfers against new deposits.

---

[35]   Other cases that attempt to engraft an exception onto standard bankruptcy law for Ponzi schemes are unpersuasive. None involve customers of a broker-dealer who deposited funds for the purpose of purchasing securities. *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987), and its progeny erroneously found that investors in a Ponzi scheme who were not customers of a registered broker were not entitled to more than their initial investment based on a perceived public policy of equality of treatment among investors. *Merrill's* equity focus ignores the plain language of the Bankruptcy Code discussed above and the admonition in *Butner* that bankruptcy courts must recognize the substantive rights of the parties afforded by state law. *See Butner*, 440 U.S. at 56 (a creditor must be "afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."). Similarly, *In re Bayou Group, LLC*, 439 B.R. 284, 338 (S.D.N.Y. 2010), did not involve a broker-dealer.

The Trustee tries to exploit, to the detriment of the customer, a transaction that would otherwise be untouchable because it occurred decades beyond any conceivable statute of limitations. For example, assume an innocent Madoff Securities customer deposited $1 million in the 1970s (when the Trustee claims the Madoff fraud began) and then in 1988 withdrew $2 million. Twenty years later, the customer deposited another $1 million. A day later, the customer withdrew the $1 million. The transactions within the two-year look-back period are plainly a wash ($1 million invested and immediately withdrawn). But under the Trustee's methodology, the $1 million that the customer deposited in 2008 is netted against—and therefore neutralized by—the ancient, time-barred fraudulent transfer made in 1988. The Trustee's desired result would render the customer liable for the $1 million received in 2008. But this resolution would violate a touchstone of fraudulent transfer jurisprudence: whether the estate was "unfairly diminished." *HBE Leasing v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *see also In re Centennial Textiles, Inc.*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (Section 550(a) enacted "to restore the estate to the financial condition it would have enjoyed if the transfer has not occurred.") (citations omitted); *In re Patts*, 470 B.R. 234 (Bankr. D. Mass. 2012) (no recovery where no loss to estate).[36]

---

[36]    *Accord, In re Bassett*, 221 B.R. 49, 55 (Bankr. D. Conn. 1998) (avoidance claim may not constitute windfall to estate); *In re Clarkston*, 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008) (defendant entitled to credit for pre-petition payment to debtor). *See also In re Adelphia Communics. Corp.*, 2006 WL 687153 at *15 (Bankr. S.D.N.Y. Mar. 6, 2006) ("the ultimate exercise in the elevation of form over substance" would be to void transfers that were ultimately returned to debtor); *In re Cybridge Corp.*, 312 B.R. 262, 271 (D.N.J. 2004) (barring recovery of transfers defendant had restored to estate on grounds that, under Bankruptcy Code § 550(d), "the trustee is entitled to only a single satisfaction under" § 550(a)); *Kingsley v. Wetzel*, 518 F.3d 874, 878 (11th Cir. 2008) (recovery of funds defendant used to pay debtor's bills "would result in an inequitable windfall" for the estate.); *In re Jackson*, 318 B.R. 5, 27–28 (D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) ("it would be a windfall to the estate to allow the [p]laintiff full recovery . . . without making an equitable adjustment to account for the proceeds" defendant used to pay estate expenses); *In re Sawran*, 359 B.R. 348, 350, 352 (S.D. Fla. 2007) (reducing

The Trustee's methodology is a form of setoff—but it is not a setoff permitted under the law.  *See, e.g.*, *In re Clayton Magazines, Inc.*, 77 F.2d 852, 853 (2d Cir. 1935) (disallowing setoff of time-barred claim:  "[O]ne against whom a set-off is claimed must still be under the legal obligation to pay the amount of the set-off to the claimant."); *In re Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996) (setoff "subject to the applicable statute of limitations").  Further, using decades-old, time-barred claims to prejudice customers conflicts with the salutary policies behind statutes of limitation.  *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("basic policies" underlying "all limitations provisions:  repose, elimination of stale claims, and certainty about . . . a defendant's potential liabilities."); *In re Independent Clearing House*, 77 B.R. 843, 887 (D. Utah 1987) (transfers only voidable within the reach-back period because "[s]uch a bright-line standard, like a statute of limitation or repose, gives certainty and finality to business transactions.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss the claims against Mr. Cohen and enter judgment for defendant based on the value defense presented.

---

judgment by amounts returned to the debtor pre-petition to avoid "windfall . . . that violates the single satisfaction rule of section 550(d).").

Respectfully submitted, this 9th day of December 2015:


**BAKER & MCKENZIE LLP**

By: /s/ Richard A. Kirby
     /s/ Laura K. Clinton
     Richard A. Kirby
     815 Connecticut Avenue, N.W.
     Washington, D.C. 20006
     Tel: (202) 452-7020
     Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com

**PRYOR CASHMAN LLP**

By: /s/ Richard Levy, Jr.
     Richard Levy, Jr.
     7 Times Square
     New York, NY 10036.
     Tel: (212) 421-4100
Email: rlevy@pryorcashman.com

**DENTONS US LLP**

By: /s/ Carole Neville
     Carole Neville
     1221 Avenue of the Americas
     New York, New York 10020-1089
     Tel: (212) 768-6889
     Email: carole.neville@dentons.com

**LOEB & LOEB LLP**

By: /s/ Gregory Schwed
     Gregory Schwed
     345 Park Avenue
     New York, New York 10154
     Tel: (212) 407-4000
     Email: gschwed@loeb.com

**MILBERG LLP**

By: /s/ Matthew A. Kupillas
     Matthew A. Kupillas
     One Pennsylvania Plaza 49th Floor
     New York, New York 10119
     Tel: (212) 613-5697
     Email: mkupillas@milberg.com